UNITED STATES of America,
Plaintiff-Appellee,

v.

Ernesto De Jesus GAVIRIA, Defendant-Appellant.

No. 72–2291.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1973.

Rehearing Denied Feb. 8, 1973.

Lawrence E. Hoffman, Miami Beach, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., P. D. Aiken, Marsha Lyons, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and MOORE * and RONEY, Circuit Judges.

RONEY, Circuit Judge:

The sole ground of appeal from this conviction for conspiracy to distribute and distribution of cocaine [21 U.S.C.A. §§ 846 and 952(a)] is that the circumstantial evidence against appellant was not sufficient to exclude to a moral certainty every reasonable hypothesis except that of guilt, so that there was insufficient evidence to support the conviction.

The government's theory was that certain co-defendants arranged with United States government undercover agents in French Martinique for an airplane pilot to transport $240,000 worth of cocaine, secreted under the pilot's seat, from Colombia, South America, to Miami, Florida, for delivery to other co-defendants, who would in turn make a sale to the agents. Appellant Gaviria, a pilot for SAM Airlines, contends that there was

* Hon. Leonard P. Moore, of the Second Circuit, sitting by designation.

not sufficient evidence from which to infer that he was that pilot. A review of the undisputed facts and the conflicting testimony reveals that there was sufficient evidence to warrant submission of the case to the jury. We affirm.

Government agents, posing as Mafia leaders, met two of appellant's co-defendants, German Urrego and Rogelio Gomez, in French Martinique and negotiated with them for the purchase of cocaine and its delivery to two additional co-defendants, Marta Salazar and Gerardo Moreno, who would be staying at the Fountainebleau Hotel in Miami. Urrego told the agents that a pilot would smuggle in the cocaine in a plane from Colombia, the route of which he described. He subsequently explained that the plane would be one day late. The plane had a cabin compartment with a false bottom and six screws.

Salazar and Moreno made delivery to the agents in Miami and were arrested, as were Urrego and Gomez in French Martinique. When arrested, Moreno had in his pocket a note containing the inscriptions "Travelers Motel," "Gaviria," "Panasonic Service, 642–8704," and "888–3361." A search of his room at the Fountainebleau disclosed a telephone note pad on which there were several impressions, including "Gaviria," "Travelers Motel," "62 Avenue," "36th Street," "Panasonic Service," "642–8704," and "888–3361," the address of the SAM Airlines terminal, "Mia. Int." and "airport."

According to a crew member's testimony, Gaviria had entered the United States as an unauthorized noncrew member of an SAM cargo plane. Testimony of other Airlines personnel showed that the dispatcher in South America was untruthfully informed by Gaviria that he had permission to be on the flight and that this was the second time appellant had made such an unauthorized trip. One undercover agent testified that Urrego had described for him the route of the plane which was to smuggle in the contraband. The route of this plane was substantially the same as that described by Urrego and was one day late, as Urrego had informed the undercover agent about the shipment. It was stipulated that in this plane's cabin was found a false-bottomed compartment fastened by six screws.

Gaviria was registered and staying at the Travelers Motel. When arrested, he had in his pocket a piece of paper on which was written the Fountainebleau Hotel's name and telephone number. Testimony of all the crew members on this flight showed that, of all the parties on the flight, only one, the appellant, had an opportunity to be alone to remove the cocaine from the plane. One crew member testified that he had helped Gaviria look up the hotel's telephone number. Another testified that he had observed Gaviria, upon arrival, attempting to locate a lady by telephone. Sometime after the plane arrived, an employee at the SAM terminal observed Gaviria pass through a gate which connected the plane area and the parking lot.

Granted use immunity, Salazar testified that she and Moreno had gone to the airport, there met Gaviria, who gave Moreno a box and then returned to the Fountainebleau. The government agent testified that he met Salazar and Moreno at the hotel and that they then had a box which contained the cocaine. Gaviria's fingerprints were not found on this box. At the hotel room, too, was found a box with an SAM Airlines label.

The Chief of Pilots testified that it was not unusual for Airlines personnel to travel to Miami as passengers on cargo flights. He further testified that, although another pilot named Gaviria was employed by SAM, he did not fly to Miami. Still another pilot of the same surname was employed by Avianca Airlines. The only box seen in the appellant's possession was the one in the Airlines' hangar which was opened by appellant in the presence of two crew members who observed that it contained a radio amplifier.

Gaviria points to the references to "Panasonic Service" and the radio ampli-

fier seen by crew members to suggest that he was delivering such equipment. He observes that many boxes at the warehouse had SAM Airlines labels on them and that, just as there were other Colombian pilots with his surname, neither he nor they actually piloted a plane to ·Miami during the period in question. He argues that references to neither the plane's route nor its delay were sufficiently specific to identify the plane on which he entered the United States. He contends, furthermore, that because the crew's activities during this wait at the terminal were generally unaccounted for, their testimony does not demonstrate that only he had the opportunity to remove the cocaine.

On the basis of these arguments, appellant submits that the jury. could not reasonably exclude the hypothesis that there was another pilot whose name was Gaviria who was in Miami on that day and who was responsible for the criminal acts. He thus argues that the evidence could raise reasonable inferences other than guilt.

■ It is well established that where circumstantial evidence is relied on to sustain a verdict, the evidence must be such that it excludes every reasonable hypothesis except that of guilt. Surrett v. United States, 421 F.2d 403 (5th Cir. 1970); Riggs v. United States, 280 F.2d 949 (5th Cir. 1960).

■■ As this Court has pointed out in United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971), the difficulties in delineating the extent to which circumstantial evidence must be inconsistent with every reasonable hypothesis except that of guilt are lessened by remembering that Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), requires that evidence be viewed in the light most favorable to the government where a guilty verdict has been rendered. Additionally, the test to be applied is not simply whether in the opinion of the appellate court the evidence fails to exclude every reasonable hypothesis except that of guilt, but rath-

er whether the trier of fact might reasonably so conclude. United States v. Sidan-Azzam, 457 F.2d 1309 (5th Cir. 1972); Roberts v. United States, 416 F. 2d 1216 (5th Cir. 1969); Harper v. United States, 405 F.2d 185 (5th Cir. 1969).

■ This evidence, admittedly, was all circumstantial, but viewing the evidence in the light most favorable to the government, we find that the jury could conclude that the above-mentioned inferences suggested by appellant were merely conjectural and were not reasonable in light of all of the evidence indicating that appellant was the pilot in question.

Affirmed.