**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael APOLLO, Defendant-Appellant.**

**No. 72–2005.**

United States Court of Appeals,
Fifth Circuit.

April 3, 1973.

Rehearing Denied May 18, 1973.

Robert J. Lerner, William M. Coffey, Milwaukee, Wis., for defendant-appellant.

William S. Sessions, U. S. Atty., Wayne F. Speck, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before ALDRICH,* SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Michael Apollo was convicted after a jury trial on two counts related to smuggling untaxed marijuana into the United States from the Republic of Mexico.

The first count alleged that Apollo engaged in a conspiracy with thirteen other defendants to import marijuana in violation of 21 U.S.C. § 963. The second count charged Apollo and three others with the substantive offense of importing approximately 700 pounds of marijuana in violation of 21 U.S.C. § 952(a) and 21 U.S.C. § 960(a)(1). He appeals. We reverse.

## I. SUFFICIENCY OF THE EVIDENCE

■ Apollo contends that the evidence presented at trial was insufficient to support his conviction and therefore that his motion for a directed acquittal was improperly denied.[1] We recite the proof in the light most favorable to the jury's verdict. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### A. *The Company*

Direct evidence consisting of the testimony of guilty-pleading co-defendants and an unindicted co-conspirator established the existence of an extensive marijuana smuggling operation known to the participants as The Company. The central parties of this conspiracy were Dr. Willis B. Hollingsworth and members of the Estes family.[2] To assist in the importation and distribution of marijuana, The Company enlisted the assistance of additional parties including David Willingham, a licensed aircraft pilot, and Philip Homburg who served as sales agent for The Company in Indianapolis, Indiana. Between May and September 1971, The Company's aircraft made at least seven trips to northern Mexico and returned to the United States with substantial quantities of marijuana. The next-to-the-last of these trips occurred

---

* Hon. Bailey Aldrich, Senior Circuit Judge of the First Circuit, sitting by designation.

1. Since there was no motion in the alternative for a new trial based on the insufficiency of the evidence, reversal on this ground would require that the indictment be dismissed. United States v.

Musquiz, 445 F.2d 963, 966 (5th Cir. 1971); 2 Wright, Federal Practice and Procedure § 470 (1969).

2. Hollingsworth and five members of the Estes family pled guilty to the conspiracy and substantive charges alleged in the indictment.

on September 10 when Willingham delivered 1,100 pounds of Mexican marijuana to Homburg in Indianapolis. The following day, after a stop-over in Milwaukee, Wisconsin, to pick up William Estes and 5,000 dollars, Willingham flew back to Sabinas Hidalgo, Mexico, where the 5,000 dollars was used by Dr. Hollingsworth to purchase another shipment of 700 pounds. A few hours later Hollingsworth and Willingham were arrested by customs officers at the San Antonio, Texas airport. Two days later, Homburg was arrested while transporting the prior 1100-pound delivery of marijuana from Indianapolis to Milwaukee.

### B. *The Milwaukee Connection*

Through Philip Homburg, The Company had made connection with Charles Cocroft, a wholesale dealer in marijuana in Milwaukee. In August 1971, Homburg made several deliveries of Company marijuana to Cocroft. By the end of the month Cocroft informed The Company that he had a potential purchaser for much larger quantities of the weed—up to 1,000 pounds per week—if the price could be reduced to 100 dollars per pound. On September 11 William Estes went to Milwaukee to authorize this reduced price contract for The Company. During these negotiations with Estes, Cocroft left the meeting with approximately 100 pounds of marijuana, then returned with the 5,000 dollars, and announced that the deal with the large-scale retail dealer had been consummated. Cash in hand, Estes and Willingham left immediately on the first leg of the ill-fated round trip to Sabinas Hidalgo.

### C. *Apollo and The Company*

Michael Apollo's alleged role in the conspiracy was as the retail distributor to whom Cocroft sold and agreed to sell Company marijuana. At the date of Apollo's trial Cocroft, who had been arrested and released on bond, was a fugitive from justice. Since none of the other alleged conspirators ever dealt directly with Apollo, proof of his conspiracy participation rests on testimony of witnesses who described what they saw and heard of the negotiations between Cocroft and Apollo, or who simply repeated what Cocroft told them. The Government's evidence against Apollo consisted of (1) testimony of Philip Homburg concerning three meetings between Cocroft and Apollo; (2) testimony of Dean Johnson about transfers of marijuana and accompanying conversations between Cocroft and Apollo; (3) testimony of co-defendants Homburg and William Estes regarding statements made to them by alleged co-conspirator Cocroft that Michael Apollo was the retail distributor with whom Cocroft had worked out an agreement to sell Company marijuana; (4) testimony of Carol Hoagland, a girl Apollo dated, that in November 1971 Apollo told her he was then dealing in marijuana; and (5) two bricks of marijuana which were found in Apollo's car when it was seized in March 1972.

### D. *Twice-Told Tales*

In Montford v. United States, 200 F.2d 759, 760 (5th Cir. 1952), this court laid down the rules governing the sufficiency of evidence in cases where, as here, testimony is introduced to prove the defendant's connection with a conspiracy by hearsay statements and declarations of persons named as his co-conspirators but not otherwise proven to be such:

> The declarations of one conspirator made in furtherance of the objects of the conspiracy, and during its existence, are admissible against all members of the conspiracy. Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. But a defendant's connection with a conspiracy can not be established by the extrajudicial declarations of a co-conspirator, made out of the presence of the defendant. There must be proof *aliunde* of the existence of the conspiracy, and of the defendant's connection with it, before such statements become admissible as against a defendant not present when they were made. Glasser v. United

States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680, 701 . . . .

In testing the sufficiency of the evidence to support Apollo's conviction, we must therefore disregard the extensive testimony which recited Cocroft's statements to his fellow conspirators implicating Apollo as the retail outlet for The Company's marijuana. See Panci v. United States, 256 F.2d 308 (5th Cir. 1958).

### E. *Evidence of Subsequent Offenses*

■ The proof that tended to link Apollo with dealing in marijuana two to six months after the alleged conspiracy and importing offenses for which he was on trial was improperly admitted. At the outset it must be borne in mind the evidence did not show convictions although they strongly tended to indicate conduct which would violate the laws of Wisconsin. Next, we consider that it was the Government's assertion that the probity of this proof lay in its tendency to show a pattern or scheme of conduct. The problem for this theory is that Apollo was not on trial for being a marijuana pusher but for illicitly introducing the weed into the United States.

The proper test for balancing the substantial relevance and materiality such subsequent misconduct evidence must possess against the less-than-subtle prejudice it carries is well defined in prior precedent and need not be reiterated. See United States v. Johnson, 453 F.2d 1195 (5th Cir. 1972) and the cases there cited. See also the proposed Rules of Evidence for United States Courts and Magistrates § 404(b) and 2 J. Wigmore on Evidence § 304.

Apollo's November admission to Miss Hoagland that he was then dealing in marijuana and the discovery of two bricks of the substance in a search of his car in March obviously constituted two strikes against him with the jury.[3] Just as with prior conviction evidence, such proof of subsequent suspicious activity must be limited to that which substantially relates to an element of the present offense to be admissible. This proof won't pass muster and it should not have been allowed.[4]

### F. *The Good Stuff*

Stripped of the toxic hearsay and prejudicial "bad man" evidence, the Government's proof is reduced to establishing four meetings between Cocroft and Apollo. The first occurred in mid-August 1971, immediately after Philip Homburg had delivered a load of Company marijuana to Cocroft's Milwaukee apartment. Both Homburg and Johnson testified that they saw Apollo enter Cocroft's bedroom which served as a warehouse for Company marijuana; however, neither witness overheard any conversation which may have occurred therein. Johnson testified that upon leaving the bedroom Apollo was carrying a closed, plastic sack containing what Johnson believed to be compressed bricks of marijuana. At that moment and in Johnson's presence, the following exchange occurred:

COCROFT: "Can you handle it?"

APOLLO: "Oh yes, I can handle it. I'm going to run it up to Madison."

COCROFT: "I need the money as soon as possible because I want to recop [*i. e.* repurchase] so that we can get orders and things going."

---

3. We note that, having defended the admission of the two bricks on the ground that this evidence tended to show the commission of the offense of conspiracy seven months prior to the seizure, the government inconsistently argues, in regard to the maximum consecutive sentences imposed on Apollo after the present convictions, that this marijuana was evidence of the commission of a separate offense of possession of marijuana for resale during the period when Apollo was free on pretrial bail.

4. In light of our decision in Part II of this opinion, we do not decide whether its introduction standing alone constituted reversible error. We simply hold that this proof added nothing to the sufficiency of the evidence to support the Government's conspiracy case.

APOLLO: "Well, I'll get the money as soon as possible. Is it good stuff?"

COCROFT: "It is Mexican. I only have the best."

Homburg testified that he was in Cocroft's apartment during two additional meetings between Cocroft and Apollo in late August or early September. However, on neither occasion did Homburg overhear private conversations between the two men nor did he observe a transfer of marijuana or any other incriminating activity.

█ Johnson testified that he was present at a fourth meeting between Cocroft and Apollo on September 11, the day of William Estes' visit to Milwaukee. At this time Johnson observed the transfer of suitcases by Cocroft and Apollo from Cocroft's automobile to Apollo's car. During the transfer, Johnson overheard the following conversation:

COCROFT: "It looks like we're just moving."

APOLLO: "I've got to leave right now to run up to Madison."

COCROFT: "Good. I've got some stuff coming right away and they want cash for it."

Apollo makes no contention that Johnson's recitation of these conversations between Cocroft and Apollo were inadmissible hearsay. These conversations are clearly admissible as *res gestae* or as admissions and adopted admissions of the defendant. McCormick, Law of Evidence § 239, § 246, § 274.

### G. *The Test Applied*

Apollo contends that above recited evidence does not prove that he had entered into an illicit agreement with the members of the smuggling conspiracy and, in fact, proves nothing more than that Apollo was a purchaser of Company marijuana. Apollo relies upon the opinion of the Seventh Circuit in United States v. Ford, 324 F.2d 950, 952 (1963): "The relationship of buyer and

seller absent any prior or contemporaneous understanding beyond a mere sales agreement does not prove a conspiracy . . . . In such circumstance, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective." This court has recently cited *Ford* for the proposition that: "Absent an agreement to advance a joint interest, any purchases and sales . . . would normally not constitute conspiratorial activity." United States v. Cook, 461 F.2d 906, 910 (1972). See also United States v. Koch, 113 F.2d 982 (2d Cir. 1940) (single purchase of narcotics insufficient to prove conspiracy); United States v. Varelli, 407 F.2d 735, 748 (7th Cir. 1969) (isolated purchases of merchandise stolen from Interstate Commerce insufficient to prove conspiracy).

The Government, in response, cites a line of cases following the Second Circuit's opinion in United States v. Bruno, where that court indicated that proof of purchases and sales of narcotic drugs, without other evidence of agreement, was a sufficient basis upon which a jury could infer a conspiratorial connection among the participants. The reasoning was epitomized thus:

> The evidence did not disclose any cooperation or communication between the smugglers and either group of retailers, or between the two groups of retailers themselves; however, the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole.

105 F.2d 921, 922, rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). See also United States v. Tramaglino, 197 F.2d 928, 931 (2d Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952); United States v. Reina, 242 F.2d 302, 306–307 (2d Cir.), cert. denied, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957); Valentine v. United States, 293 F.2d 708 (8th Cir. 1961), cert. denied, 369 U.S. 830, 82 S.Ct. 848, 7 L.Ed.2d 795 (1962); *but see* United States v. Aviles, 274 F.2d 179, 189–190 (2d Cir.), cert. denied as to various parties, 362 U.S. 974–982, 80 S. Ct. 1057–1073, 4 L.Ed.2d 1009–1016 (1960).

■ We find it unnecessary in this case to define precisely how limited purchases, in number or size, may be in such "mere purchases" cases and still permit the intent to participate in an unlawful conspiracy to be inferred by a jury. *Compare* United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) *with* Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). In the present case, there was direct proof of a continuing relationship between Apollo and Cocroft, a known conspirator, which resulted on at least two occasions in the witting transfer of Company marijuana to Apollo. Furthermore, the conversations between Apollo and Cocroft in the presence of third parties demonstrate that Apollo was aware of Cocroft's involvement with one or more other parties in a large-scale operation to illicitly import and distribute marijuana. Whether Apollo was intended to be within Cocroft's "we" when Cocroft stated he needed the proceeds from Apollo's re-sales so *"we* can get orders and get things going" or when he told Apollo, "It looks like *we*'re just moving," these statements indicated that Apollo was fully aware that he was the product out-let and the source of cash inflow that enabled the unlawful plan to operate. We find this evidence, although cloudy as to the exact terms of agreement between Cocroft and Apollo, sufficient to support a reasonable inference that Apollo had entered an illicit joint venture with Cocroft and his co-conspirators. In terms of this Circuit's test for the sufficiency of circumstantial evidence in criminal cases, "reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence." United States v. Warner, 441 F.2d 821, 825 (5th Cir.), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); United Sttaes v. McGlamory, 441 F.2d 130 (5th Cir. 1971); United States v. Gaviria, 471 F. 2d 1181, 1183 (5th Cir. 1973).

■■ It cannot be gainsaid that the viable evidence in this case was skimpy. This is frequently true in conspiracy situations, nevertheless the evidence, when viewed most favorably to the correctness of the jury's conclusion, was sufficient to support a guilty verdict in regard to Apollo's participation in the conspiracy. Since it was and since a party to a conspiracy is liable as a principal for all offenses committed in furtherance of the conspiracy while he is a member, Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Roberts v. United States, 416 F.2d 1216, 1223 (5th Cir. 1969); Gradsky v. United States, 376 F.2d 993, 996 (5th Cir.), cert. denied, Grene v. United States, 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 224 (1967), the jury was entitled to hold Apollo responsible for the substantive offense charged in Count Two.[5]

## II. CONSPIRATORIAL HEARSAY

Despite the fact that we find the trial record evinces marginally sufficient non-hearsay evidence to support Apollo's convictions, it is clear that the guilty

5. The Government now argues that Apollo could have been convicted as an aider and abettor under 18 U.S.C. § 2. The case was not submitted to the jury on that theory, the Government's requested charge having been given strictly in terms of *Pinkerton* liability. A conviction cannot be affirmed on appeal on a theory which was not presented to the jury.

verdicts cannot be permitted to stand. Virtually from the starting gun, the court allowed the Government erroneous hearsay shortcuts that mandate reversal.

In Lutwak v. United States, the Supreme Court taught this rule:

In the trial of a criminal case for conspiracy, it is inevitable that there shall be, as there was in this case, evidence as to declarations that is admissible as against all of the alleged conspirators; there are also other declarations admissible only as to the declarant and those present who by their silence or other conduct assent to the truth of the declaration. *These declarations must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them.* Even then, . . . the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose. [emphasis added]

344 U.S. 604, 618–619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). *Cf.* Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Lutwak* established a minimum obligation on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony. *See* Menendez v. United States, 393 F.2d 312 (5th Cir. 1968), cert. denied, 393 U.S. 1029, 89 S. Ct. 639, 21 L.Ed.2d 572 (1969).

The order of admission of proof in a conspiracy case is, of course, a matter within the discretion of the trial court. See, *e. g.*, United States v. Rhoden, 453 F.2d 598, 600 (5th Cir.), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972); United States v. Knight, 416 F.2d 1181, 1185–1186 (9th Cir. 1969); Downing v. United States, 348 F.2d 594, 600 (5th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). Testimony concerning the declarations of co-conspirators *may* be admitted before the existence of the conspiracy is established by independent evidence. But the unmistakable hazard of allowing this procedure highlights the need for the court to condition the minds of the jurors so that they will not fail to remember that none of this hearsay will bootstrap the necessary establishment of the conspiracy itself by firsthand proof.

From beginning to end, the record in the present case is replete with the instances in which government witnesses recited extrajudicial statements from Cocroft and other alleged co-conspirators linking Michael Apollo to the smuggling conspiracy. Upon the first instance of such testimony, the defendant promptly objected to its introduction without a cautionary instruction. Not only did the court overrule this objection, but further stated in the presence of the jury that "connection with conspiracy must of necessity be established by some hearsay in this kind of case." Thereafter, without further comment and over consistent defense objections, the court permitted a veritable flood of similar hearsay testimony.

The Government calls our attention to the charge given by the court at the conclusion of the trial. While it does contain an accurate statement of the role of hearsay evidence in conspiracy cases, it came too late. This delicately dangerous defusing must be firmly in the jury's minds when the hearsay is proffered. An instruction at the end

of the trial cannot correct the erroneous refusal to give the proper cautionary instruction when it was first requested.

We expressly pretermit ruling on the remaining errors asserted.

Reversed.