**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Russell J. MOORE, Defendant-
Appellant.**

**No. 74-1433.**

United States Court of Appeals,
Fifth Circuit.

Dec. 19, 1974.

Rehearing Denied Jan. 24, 1975.

Denis A. Dean, Miami, Fla. (Court-appointed), for Moore.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Asst. U. S. Atty., Miami, Fla., William McD. Miller, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and AINSWORTH and DYER, Circuit Judges.

AINSWORTH, Circuit Judge:

This appeal stems from a loan brokerage swindle that resulted in a 29-count indictment against 17 defendants. We deal here, however, only with the conviction of appellant Russell Moore on 21 counts of fraud by mail (18 U.S.C. § 1341), fraud by wire (18 U.S.C. § 1343), interstate transportation of a check taken and converted by fraud (18 U.S.C. § 2314) and conspiracy to commit such offenses (18 U.S.C. § 371). Moore's conviction resulted in an 8-year prison sentence and a $7,000 fine. We affirm.

I.

The jury trial below commenced on November 12, 1973, and the jury returned its verdicts on December 10, 1973. The trial produced in excess of 2,800 pages of transcript while hearing evidence and testimony from some 40 witnesses. We will not attempt to set forth all the evidence, but rather we will summarize it with emphasis on Moore's part in the scheme.

The defendants' plan utilized paper corporations in Canada and the United Kingdom, and stemmed from the tight credit situation in the United States in 1970–1971. During this period, businessmen and developers in this country were often unable to obtain substantial loans from conventional lending sources for the purpose of expanding present enterprises or embarking on new ones. The effect of this conventional loan shortage was an active search by prospective borrowers for new lending sources. Loan brokers began doing a brisk business of locating available sources of money and bringing together borrower and lender. For their services, these brokers would receive a fee, usually a percentage of the loan received.

The proof at trial, taken in the light most favorable to the Government, indicated that the scheme was to represent certain defendants as being loan brokers able to persuade a substantial company to loan funds to "qualified" borrowers. Various borrowers (more than 20) contacted the brokers who would indicate that they were in contact with a lending source, and that the company was interested in the borrower's proposed project. At the time a borrower made an application for a loan with the brokers, the borrower was required to place one half the total brokerage fee in escrow pursuant to written agreement. Russell Moore was President of United Title and Escrow, and acted as escrow agent in approximately 20 deals.[1] A few days after application and deposit of the first half of the fee in escrow, the borrower would be contacted and told that a loan

1. Another person acting as an escrow agent, William Smith, was convicted with Moore on 8 counts and sentenced to 10 years' imprisonment and a $10,000 fine. Smith's appeal was dismissed after he took up residence in Costa Rica.

commitment[2] had been arranged. Only after the borrower paid the rest of the brokerage fee into escrow would he be given the name of the company issuing the loan commitment. The escrow agreement all provided that upon issuance of a loan commitment, the escrow account would terminate and Moore would disburse the escrow money to the brokers.

The arrangement had every appearance of commercial reasonableness and regularity, and attracted reputable businessmen from throughout the country. The nub of the scheme, however, was that the conspirators had set up a paper corporation, Anglo-Canadian Group, Ltd. (a Canadian corporation), to issue the loan commitments. While all the borrowers were assured that Anglo-Canadian had assets in excess of $100 million, Anglo-Canadian's chief asset was a telephone number in Montreal; Anglo-Canadian's loan commitments were worthless. Thus, for example, one borrower, United States Capital of Ohio, paid the conspirators a total of $120,000 to obtain a valueless loan commitment for $3 million. Predictably, neither United States Capital nor any of the other borrowers obtained interim financing on the strength of Anglo-Canadian's meaningless loan commitment. Failing to receive their loans as planned, the frustrated borrowers would return to Moore, demanding their money back. Moore would proclaim that he was merely a neutral intermediary who had nothing to do with the loan transaction, and point out to the enraged businessmen that the escrow contract was drawn up to terminate when a loan commitment was received, and not when a loan was actually obtained.

## II.

Although Moore was not the only escrow agent involved in this scheme, a total of $487,500 was placed into the escrows for which Moore was escrow agent. There was testimony at trial indicating that Moore was to receive 10 per cent of all monies placed in escrow with him. More than 20 times, Moore acted as escrow agent for businessmen securing commitments from Anglo-Canadian. Each time, the borrowers returned to Moore, demanding their money back because Anglo-Canadian's loan commitment was valueless. Moore contended at trial and on appeal that he was acting only as an independent escrow agent, and had no connection with this scheme. His appeal asserts two bases for reversal: (1) the evidence was insufficient to sustain Moore's conviction on any count of the indictment, and (2) the trial court erred in allowing hearsay testimony to be heard by the jury without the cautionary instruction required by *United States v. Apollo*, 5 Cir., 1973, 476 F.2d 156.

### A. Sufficiency of the Evidence

Based merely on the evidence we have already adverted to, a jury could reasonably conclude that Moore played an active role in the conspiracy, and that he was not a passive and neutral bystander. But there was additional evidence on which the jury could base its conviction. One witness testified that he observed changes being made in the documents relating to Anglo-Canadian loan commitments in Moore's office under Moore's direction. Testimony indicated that Moore assured numerous borrowers that Anglo-Canadian had assets in excess of $100 million, giving some of them a company balance sheet to this effect which was totally without foundation. At one meeting, an attorney for a borrower informed Moore that the borrower's bank had checked out Anglo-Canadian and found it to be "nothing but an office or two and a telephone or two."

2. A loan commitment was described at trial as a guaranty that, upon completion of a project or development, a lender would give the borrower/developer a permanent mortgage. The loan commitment was thus to be used to repay construction loans obtained initially from sources other than the institution issuing the loan commitment. The borrowers hoped to obtain the interim loans or construction financing on the strength of the loan commitment.

Not only did Moore tell the attorney that some mistake must have been made, but he also continued to act as escrow agent in similar situations after receiving this information about Anglo-Canadian. In fact, in a later deal, he assured one borrower that he (Moore) had no reason whatever to doubt that Anglo-Canadian was not what it purported to be.

■ Taking the evidence in the light most favorable to the Government, we have no hesitation in finding that a reasonable jury could conclude that this evidence is inconsistent with the hypothesis of Moore's innocence. United States v. Warner, 5 Cir., 1971, 441 F.2d 821, 825, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. Moore contends that where the case rests on circumstantial evidence, we must take special pains to assure that every hypothesis of guilt is excluded. While some Fifth Circuit cases have suggested that there is a more stringent testing of the sufficiency of the evidence in cases relying on circumstantial evidence,[3] this Court has since stated that "[t]he same test . . . for judging the sufficiency of the evidence should apply whether the evidence is direct or circumstantial." United States v. Warner, *supra*, 441 F.2d at 825; *see* 2 C. Wright, Federal Practice and Procedure § 467, at 258–259. Subsequent cases have made clear that the proper test in all cases is not whether the trial court or the appellate court is able to find the evidence inconsistent with every hypothesis of innocence, but whether a reasonably minded jury could so conclude.[4] Regardless of verbiage and the semantics involved in stating the proper test, we have concluded that there was clearly sufficient evidence for a jury to conclude beyond a reasonable doubt that Moore was an active participant in this sophisticated scheme and is guilty of the charges against him.

*B. Lack of a Cautionary Instruction*

■ Moore relies solely on United States v. Apollo, 5 Cir., 1973, 476 F.2d 156, for the proposition that the trial judge committed reversible error in failing to give a cautionary instruction to the jury regarding hearsay testimony, to the effect that coconspiratorial hearsay was inadmissible against persons other than the declarant until such time that the conspiracy was established by nonhearsay testimony. Failure to give such an instruction led to reversal in *Apollo*. *Apollo* involved a case where the record was "replete with . . . extrajudicial statements" and where the court permitted "a vertible flood" of hearsay testimony. 476 F.2d at 163. When the first of this hearsay was offered, "the defendant promptly objected to its introduction *without a proper cautionary instruction*." *Id.* (emphasis added); *see also id.* at 163–164. Moreover, the trial judge in *Apollo* not only failed to give a requested cautionary instruction, "but further stated in the presence of the jury that 'connection with conspiracy must of necessity be established by some hearsay in this kind of case.'" 476 F.2d at 163.

The present case differs from *Apollo* in at least three important respects. First, *Apollo* addresses the prejudice resulting from hearsay. While Moore's counsel made over 50 objections to testimony, claiming it to be hearsay, our own review of the record reveals that most of these did not in fact involve hearsay. For example, counsel objected when witnesses testified that Moore was present at certain meetings, that Moore told them Anglo-Canadian was a substantial

3. *See, e.g.,* Barnes v. United States, 5 Cir., 1965, 341 F.2d 189, 192; Newsom v. United States, 5 Cir., 1962, 311 F.2d 74, 78; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949, 955.

4. *See, e.g.,* United States v. White, 5 Cir., 1974, 493 F.2d 3, 7; United States v. Jeffords, 5 Cir., 1974, 491 F.2d 90; United States v. Polite, 5 Cir., 1974, 489 F.2d 679; United States v. Stephenson, 5 Cir., 1973, 474 F.2d 1353; United States v. Sidan-Azzam, 5 Cir., 1972, 457 F.2d 1309; United States v. Garza, 5 Cir., 1970, 426 F.2d 949; United States v. Andrews, 5 Cir., 1970, 427 F.2d 539.

4

company, and that Moore assured them he would look into certain matters. These extrajudicial acts and statements were not introduced to prove the truth of the matter asserted; rather, they constituted direct evidence of Moore's activities and involvement in specific transactions, or his knowledge of facts otherwise established. Not every reference to an out-of-court statement constitutes hearsay. *Cf*. United States v. Frank, 2 Cir., 1974, 494 F.2d 145, 155. Thus, *Apollo* is inapplicable here because the objections concerned direct evidence which was properly admitted by the trial court.

*Apollo* is also distinguishable in that, in the present case, Moore's counsel failed to make a timely request for a cautionary instruction. Not until the Government's case was nearly complete, and after the trial had progressed through almost 1,600 pages of transcript, did counsel make a request for a cautionary statement to the jury. The effect of this failure to timely request an instruction is that we can reverse Moore's conviction only if the court's failure to give the instruction *sua sponte* constitutes plain error which significantly and substantially prejudiced Moore. Fed.R.Crim.P. 52(b). There was no plain error here. *Apollo* may establish that a cautionary instruction must be given if properly requested; it clearly does not require an instruction where none is requested. As this Court has already held in United States v. Jimenez, 5 Cir., 1974, 496 F.2d 288, 291, we conclude that unless manifest prejudice is shown, failure to timely request an *Apollo* instruction precludes a finding of error on appeal.[5]

More to the point, however, is the fact that there has been and can be

no showing by Moore of any prejudice resulting from the failure in this case to give a cautionary instruction to the jury. Moore's counsel conceded at oral argument that the conspiracy was adequately established by independent evidence. We have concluded on our own review of the evidence that Moore was definitely linked to the conspiracy by nonhearsay evidence. Thus, the jury was entitled to impute the words and actions of coconspirators to each other without limitation. What Moore requests is that we reverse his conviction because the trial court failed to give an instruction which at best was superfluous. It would seem to be harmless error, if error at all, for a court to fail to limit a jury's consideration of hearsay testimony when the evidence *aliunde* strongly indicates both the existence of a conspiracy and a defendant's participation therein. In such circumstances, the jury may impute acts and statements to coconspirators without restriction, and a cautionary instruction turns out to be a meaningless gesture.[6]

Our conclusion that Moore suffered no prejudice at trial is buttressed by the fact that in this case, unlike *Apollo*, the trial judge was careful to avoid the prejudice to defendants possible in complex conspiracy trials. Judge King carefully limited the admissibility of witnesses' statements, struck testimony he found to be irrelevant or overly prejudicial, and even excused one witness when the court determined that the prejudice inherent in the witness' testimony far outweighed the probative value of the evidence. Such facts negate the possibility that the jury was empowered to use testimony in an unrestrained manner in reaching its verdict.

5. In *Jimenez*, the Court further noted that the jury had been properly instructed both on the conspiracy issue and on the use of a coconspirator's hearsay testimony. 496 F.2d at 291 & n. 6. Although the charge to the jury is not contained in the record on appeal, we must assume that the jury was properly charged in that no instruction is challenged on appeal.

6. In this regard, we note that *Apollo* was a weak case in which excessive, uncautioned hearsay testimony likely created substantial prejudice. As Judge Clark noted in *Apollo*, "It cannot be gainsaid that the viable evidence in this case was skimpy." 476 F.2d at 162.

For these reasons, we conclude that there was no error in the failure to give a cautionary instruction, and that *Apollo* is not applicable to this appeal. Thus, we do not reach the Government's contention that it is unwise for trial courts to give cautionary or limiting instructions at the time evidence is introduced subject to subsequent connection to a conspiracy or a coconspirator.

Affirmed.