**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Melvin POITIER and Warren Hope,**
**Defendants-Appellants.**

**No. 79–5143.**

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1980.

---

Thomas G. Sherman, Miami, Fla. (Court-appointed), for Melvin Poitier.

Donald L. Ferguson, Miami, Fla., for Warren Hope.

Jack V. Eskenazi, U. S. Atty., Barbara D. Schwartz, Asst. U. S. Atty., Miami, Fla., for the U. S.

Before SIMPSON, HILL and HATCH-ETT, Circuit Judges.

SIMPSON, Circuit Judge:

Appellants, Warren Hope and Melvin Poitier, were convicted in a jury trial of possession of cocaine with intent to distribute, distribution of cocaine, 21 U.S.C. § 841(a)(1), and conspiracy to commit the two substantive offenses. 21 U.S.C. § 846. Appellant Hope was also convicted of aiding and abetting, 18 U.S.C. § 2, and use of a communication facility in the commission of a felony. 21 U.S.C. § 843(b). Hope argues the trial court committed reversible error by allowing hearsay evidence to be received and by improperly instructing the jury on the coconspirator exception to the hearsay rule. Poitier argues that the evidence was insufficient to support the jury verdict against him and that improper statements by the prosecutor during closing argument deprived him of a fair trial. Both argue they were denied due process by the government's failure to comply with the standing discovery order and by the government's failure to correct certain false testimony. We find no reversible error and affirm.

## FACTS

There were six principals involved in the illicit drug conspiracy underlying the indictment. Appellant Hope was at the top of this drug distribution chain. Hope generally conducted his "business" through Bessie Elaine Pittman (Elaine), his 22 year old girl friend. She and Hope supplied cocaine to McArthur Fort and his wife (Jo Ann Fort). The Forts, aided by their nephew, appellant

Poitier, sold the cocaine to James LaPlaca, who was Poitier's employer, and to a Drug Enforcement Agency (DEA) Agent. The record, when viewed in the light most favorable to the government reveals the following activities of the conspiracy.

In late August or early September of 1978 LaPlaca, the owner of an auto repair business in Miami, Florida, desired to purchase substantial quantities of cocaine. He communicated this desire to his employee, Poitier, and asked Poitier to hook him up with a seller. Poitier, evidently aware that his Uncle, McArthur Fort, trafficked in illegal drugs, contacted Fort approximately four times during the first three weeks in September and told Fort of LaPlaca's desire to purchase large quantities of cocaine. Finally Poitier introduced his uncle and his employer over the telephone as prospective seller and buyer of drugs. LaPlaca inquired whether Fort could arrange a supply of five kilograms (kilos) of cocaine per month. Fort indicated that he would try and turned to appellant Hope because he had sold cocaine for Hope before. After meeting and negotiating with Hope's girl friend, Elaine, several times, Fort finally talked directly with Hope on September 19. Hope said "they" would only sell one kilo of cocaine at a time.

LaPlaca had previously contacted Mazzilli, who unknown to LaPlaca at that time, was a DEA undercover agent. On September 19 LaPlaca delivered a small sample of cocaine to Agent Mazzilli as a preview of things to come.

Fort and LaPlaca arranged to meet at LaPlaca's business on September 20 to consummate the drug transaction. Fort picked up the first kilo from Elaine at 10:30 that morning and delivered it to LaPlaca. LaPlaca took possession of the kilo, and told Fort to wait in an adjacent building as the transaction would take about two hours. LaPlaca then called Agent Mazzilli. The agent arrived at approximately 10:35 A.M. accompanied by two other DEA agents. Agent Mazzilli showed LaPlaca the previously agreed upon sum of money ($43,000). LaPlaca counted it and reciprocated by giving Mazzilli the kilo. The agent weighed and field tested the drug and then arrested LaPlaca. At Mazzilli's urging, LaPlaca agreed to aid the DEA in capturing the other members of the conspiracy. At about 1:30 P.M. the agents and their newly acquired assistant walked to the adjacent building to meet Fort.

Mazzilli was introduced to Fort as a buyer and he told Fort that he wanted at least two kilos to take back to New York with him. Fort indicated he would contact his source and tried, without success to do so. During these efforts Fort informed Mazzilli that "Elaine" was the girl friend of his source. Around 5:00 P.M. all left after agreeing that Fort would call Mazzilli at 6:00 P.M. to continue negotiations.

Fort eventually reached Hope by telephoning Elaine's house. The buyer's desire for at least two kilos was explained. Hope responded that he would call Fort back after checking on another kilo. Shortly thereafter Hope's girl friend Elaine called and instructed Fort to come to her house. When Fort and his wife arrived Hope and Elaine were present. Hope inquired whether Fort knew the buyers and whether everything was OK; Fort assured Hope that there were no problems. Hope handed the second kilo to Elaine who in turn handed it to Fort. The Forts returned home to await Mazzilli's call.

The call soon followed. Mazzilli and Fort agreed to rendezvous at a nearby Burger King at 7:00 P.M. Fort and his wife arrived at the appointed hour, but Mazzilli was not there so they traveled to LaPlaca's place of business. The only person at the shop was Poitier. Fort related the drug transaction to Poitier including the recent delivery of the first kilo. Fort further explained that his source was concerned and that LaPlaca was acting funny. Fort asked Poitier whether LaPlaca could be trusted. Poitier told his uncle not to worry because he knew LaPlaca and LaPlaca could be trusted. The trio, Fort, his wife and his nephew Poitier, proceeded to Fort's home. En route Fort explained he was expecting a call from Mazzilli. Poitier responded that

he wanted to go to the Burger King where LaPlaca was.

LaPlaca, Mazzilli and several other DEA agents reached the Burger King at 7:25 P.M. Mazzilli immediately called Fort at home, and Fort indicated that he would bring the drugs. After ten or fifteen minutes had passed Poitier and Fort's wife, Jo Ann, arrived. A conversation ensued in Poitier's presence.

The agent said he had the money for both kilos and he preferred to buy both kilos, but, if the sellers preferred, he would either return the first kilo or buy only the first kilo. Jo Ann replied that Fort was bringing the second kilo. Mazzilli explained that he had the money in the car and proceeded to show it to her and Poitier. Jo Ann then left saying she was going to try to hurry Fort up so the deal could be completed. Poitier remained at the Burger King with Mazzilli. Some five or ten minutes later Poitier expressed considerable concern over the number of police vehicles in the area.[1] He identified several vehicles, including an unmarked DEA surveillance vehicle as police. Mazzilli agreed that there were probably "cops" in the area, and warned that he was leaving if Fort did not arrive in five minutes. Poitier responded by saying that he was going to call Fort and hurry up the deal and walked over to a pay telephone at an adjacent convenience store. He returned moments later and said "Mac [McArthur Fort] is on his way with the coke." Record vol. 3 at 125.

Five or ten minutes passed before the Forts returned. They handed the kilo of cocaine to Agent Mazzilli and were immediately placed under arrest. Poitier, who was standing fifteen or twenty yards away, was arrested by another agent.

Fort agreed to cooperate and, pursuant to Agent Mazzilli's instructions, made two telephone calls. The calls were monitored and recorded and the recordings were introduced into evidence. The first call was to Elaine Pittman. After they discussed the

problems encountered in completing the drug sale, Elaine inquired three times whether Fort wanted to speak to "Warren". Fort replied in the negative. The conversation was terminated, and Mazzilli questioned Fort as to the identity of "Warren". Fort reluctantly identified "Warren" as Warren Hope, his source of supply for cocaine. Fort spoke to Hope in the second telephone conversation. In the conversation Hope acknowledged the illicit drug scheme, indicated that *his* source was pressuring him and instructed Fort on the steps he should take in the disposition of the two kilos of cocaine. Hope's arrest, the trial and the convictions of all the principals involved in the conspiracy followed.

## THE HEARSAY TESTIMONY

██ Agent Mazzilli, over defense counsel's objection, was allowed to testify to certain post-arrest statements made by Fort. These hearsay statements were: that Hope was the source of supply for Elaine Pittman, that Hope had Pittman conduct his drug business for him; and that Hope usually worked through Elaine Pittman. Shortly thereafter the district court admitted a written post-arrest statement of Fort—again over Hope's hearsay objection. The statement substantially corroborated Fort's previous testimony. Hope's motion for mistrial was denied. The record reveals that the district judge was possibly confused as to which statements the hearsay objection included. Nevertheless the court concluded the statements were "admissible under the concept that the conspiracy in its totality had not yet terminated." Record vol. 3 at 142. We conclude that the statements were not admissible under the coconspirator rule, Fed.R.Evid. 801(d)(2)(E), because of the district court holding that Fort's membership in the conspiracy terminated upon his arrest. However, we do not reverse on this ground; we hold that the error was harmless.

---

**1.** This concern was evidenced by Poitier's statement to Mazzilli that "[t]here are cops all over the fucking place." Record vol. 3 at 124.

The statements were made after the termination of Hope's participation in the conspiracy and for that reason were not made in the course of and in furtherance of the conspiracy as required by the coconspirator exception. *United States v. Barnes*, 586 F.2d 1052, 1059 (5th Cir.1978). Even though the hearsay statements were improperly admitted, other overwhelming evidence of Hope's guilt and the unlikelihood that the evidence had a substantial influence on the outcome of the trial rendered the error harmless. *Id.* at 1059–60; *United States v. Ballard*, 586 F.2d 1060, 1062 (5th Cir.1978). Both Fort and his wife had previously testified that Hope was a source of illegal drugs and that he did his business through his girl friend, Elaine Pittman. Both also testified that they physically observed Hope pass a kilo of cocaine to Elaine and that Elaine handed it to them. Finally, the tape recorded conversation between Hope and Fort clearly and severely incriminated Hope. Admission of the hearsay was harmless error.

■ Appellant Hope also argues that he was prejudiced by an incorrect jury instruc-tion on the coconspirator exception which was given after admission of Fort's post-arrest written statement.[2] The instruction was inaccurate, but the error was harmless.

First, the instruction is susceptible to two interpretations, only one of which carries potential harm to Hope. See note 2, *supra.* Second, the potential danger is that the jury incorrectly thought that they could consider coconspirator statements if either Hope or Poitier were found a member of the conspiracy, and that the jury then found that Poitier was a member of the conspiracy but that Hope was not. In view of the other overwhelming evidence of Hope's membership in the conspiracy and the less than overwhelming evidence of Poitier's membership, it is highly unlikely that the jury reached such a conclusion. Third, the other overwhelming evidence of Hope's guilt, standing alone, makes it unlikely that the instruction would substantially affect the final outcome of the trial. Fourth, the district judge minimized the potential harm by giving a correct charge at the close of the case, before the jury retired to deliber-ate.[3] Finally, Hope did not request a cor-

**2.** The complained of instruction follows:

[A] statement given by one alleged coconspirator may only be considered when the jury considers the case as it pertains to that particular Defendant or particular alleged coconspirator.

Unless the jury should determine and decide that the Defendants on trial; namely, Warren Hope and Mr. Poitier, were members or became members by their own acts and statements of the alleged conspiracy.

If you decide they did, or either of them did, then you may consider the acts and statements of all in considering the guilt or innocence of the two that are on trial.

If you decide that the Defendants that are now on trial, as Mr. Hope and Mr. Poitier, were not members of the alleged conspiracy and did not—or by their own acts and their own statements did not become members of a conspiracy, then you may not consider the statements and acts of another alleged Defendant in determining the guilt or innocence of these two men.

In summary, you must first decide whether or not these two Defendants, Hope and Poitier, were members of an alleged conspiracy and became members by their own acts and statements with regard to what anyone else said or did.

If you decide that, then you can consider everything that was said or done.

If you decide that they were not, then you will not consider this statement or anything else that was said by any other alleged member of the conspiracy.

Record vol. 3 at 167–69. The first three paragraphs may be interpreted to mean that the jury could consider coconspirator statements if they found that either Hope *or* Poitier were members of the conspiracy. Appellant Hope argues that this portion tainted his rights to a fair trial. However, the last three paragraphs may be interpreted to mean that coconspirator statements could be considered against Hope only if Hope *and* Poitier were found members of the conspiracy.

**3.** Appellant Hope cites *United States v. Chiantese*, 560 F.2d 1244 (5th Cir.1977), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395, and *United States v. Apollo*, 476 F.2d 156 (5th Cir.1973). In *United States v. James*, 590 F.2d 575 (5th Cir.1979), *cert. denied*, 422 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283, the en banc court overruled *Apollo* prospectively. Referring to statements in these opinions Hope argues that the subsequent correct instruction cannot cure the error. These cases do not require reversal in the instant case.

rect instruction at the time the hearsay was proffered and he did not object to the instruction given by the trial court. Under these circumstances, he has failed to demonstrate that the error "significantly and substantially prejudiced" him. See *United States v. McMahon*, 592 F.2d 871 (5th Cir. 1979), *cert. denied*, 422 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289.

## SUFFICIENCY OF THE EVIDENCE AS TO POITIER

Poitier moved for judgment of acquittal at trial, arguing that the evidence was insufficient to support the jury's verdict of guilty. The motion was denied and Poitier now argues the denial was error.

*United States v. Burns*, 597 F.2d 939 (5th Cir.1979), thoroughly discusses the standard that a district court must apply when ruling on a motion for judgment of acquittal based on insufficiency of the evidence. *Burns* recognized that the standard has been variously stated as:

whether the relevant evidence, viewed in the light most favorable to the Government, could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. The

same test applies whether the evidence is direct or circumstantial. All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor;

*Id.* at 941; or

whether the jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is inconsistent with every reasonable hypothesis of the accused's innocence.

*Id.* quoting *United States v. Fredericks*, 586 F.2d 470, 474 (5th Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776; or

whether, viewing the evidence in the light most favorable to the Government, the jury must necessarily entertain a reasonable doubt as to the guilt of the defendant.

*Id.*

The evidence, viewed in the light most favorable to the government, reveals that Poitier had a significant role in the illegal drug conspiracy. He initiated the transfer of drugs from Fort to LaPlaca by contacting Fort four times over a three week period for the express purpose of hooking LaPlaca up with a source that would supply

---

*Chiantese* concerned improper instructions "couched in language which could reasonably be interpreted as shifting the burden to the accused to produce proof of innocence." *Id.* at 1255. There this court stated:

The error in giving such a burden-shifting charge will not be absolved because other phrases defining the proper burden of proof are included in the instructions, no matter how often such corrective phrases are repeated. This court no longer will harmonize inconsistent charges to effect the cure of [such] a charge . . . .

We refuse to classify the giving of [such] a charge . . . whether objected to or not, as the type of error which will automatically produce reversal. If, despite our action today, the error should recur, the weighing of its harm to the accused shall remain a judicial matter to be resolved in the context of each case where it occurs. Such weighing, however, shall not include consideration of whether a defective charge has been cured by prior or subsequent statements.

*Id.* *Chiantese* did not hold that subsequent correct jury instructions can never be con-

sidered in determining whether a defendant was prejudiced by a prior incorrect instruction and we decline to adopt such an expansive interpretation. The case only held that subsequent correct instruction may not be considered under the circumstances of *Chiantese* where the incorrect instruction is one which can be interpreted as shifting the burden of proving innocence to the accused.

*United States v. Apollo, supra,* does not require reversal either. There the court stated that "[a]n instruction at the end of the trial cannot correct the erroneous refusal to give the proper instruction when it was first requested." *Id.* at 163–64. Hope never requested a cautionary instruction as did the defendant in *Apollo*; Hope's counsel expressly stated that he did not want the instruction. Furthermore he did not object to the instruction in the court below. Additionally, in the instant case we do not completely rely on the subsequent correct instruction to cure the incorrect one; it is only one of several factors which lead to the conclusion that Hope was not prejudiced by the incorrect instruction.

five kilograms of cocaine per month. He actually introduced his uncle, Fort, to La-Placa for that purpose. He discussed the drug transaction with Fort on September 20, 1978, the day of the arrest, and assured Fort that LaPlaca could be trusted to pay for the illegal drug. On the day of the transfer Poitier was present at the Burger King. He was present while Agent Mazzilli and Jo Ann Fort discussed the imminent drug sale and he and Jo Ann inspected the money to be used for the purchase. He was extremely concerned over the presence of police in the area. Perhaps most damning, he called Fort to hurry the illicit transaction when the buyer, Agent Mazzilli, announced his intention to leave if Fort did not show up in five minutes. When he returned from the phone call Poitier stated "Mac is on his way with the coke." Record vol. 3 at 125.

■ Of course Poitier testified to a substantially different version of the facts. The jury obviously was faced with a credibility choice which it resolved against Poitier. While the evidence of guilt was not particularly overwhelming, it was sufficient to enable a reasonable juror to find beyond a reasonable doubt that Poitier was guilty of conspiring to possess and distribute the cocaine. *Compare, United States v. Apollo, supra,* 476 F.2d at 162 (comparable evidentiary factual situation which was held to be sufficient to support an inference that the defendant had joined a criminal conspiracy). See *United States v. Ashley,* 555 F.2d 462, 467–68 (5th Cir.1977) and *United States v. James,* 528 F.2d 999, 1011–12 (5th Cir.1976) for a discussion of the relevant legal principles applied in determining whether a defendant is guilty of criminal conspiracy.

■ As a party to the conspiracy Poitier is liable for all offenses committed in furtherance of the conspiracy while he was a member; therefore the jury was entitled to find him guilty of possession and distribution of the second kilo of cocaine. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Poitier seeks relief based on decisions in other circuits which hold: that the mere fact that a de-

fendant told a willing buyer how to make contact with a willing seller does not establish membership in a conspiracy, *United States v. Hysohion,* 448 F.2d 343, 347 (2d Cir.1971); *United States v. Torres,* 519 F.2d 723 (2d Cir.1975), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392; that minor participation in one transaction does not, *alone,* allow inference of membership in a criminal conspiracy. *United States v. Torres, supra; United States v. Sperling,* 506 F.2d 1323, 1347 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439; and that approval or knowledge *alone* does not result in membership in a conspiracy. *Cleaver v. United States,* 238 F.2d 766 (10th Cir.1956). These cases do not help Poitier's cause. From the evidence in the instant case the jury could reasonably conclude that Poitier performed all of the above acts and that he participated in the sale of cocaine as something he wished to bring about, actively seeking to make this goal of the conspiracy succeed. *United States v. James,* 510 F.2d 546, 552 (5th Cir.1975). *See also, United States v. Teal,* 582 F.2d 343, 347 n. 4 (5th Cir.1978) (distinguishing *United States v. Hysohion, supra,* where the defendant does more than merely introduce buyer and seller).

## THE GOVERNMENT'S FAILURE TO COMPLY WITH THE STANDING DISCOVERY ORDER

■ The standing discovery order issued by the district judge on November 9, 1978 required that the government disclose "the existence and substance of any payments, promises of immunity, leniency, or preferential treatment, made to prospective government witnesses, within the scope of *United States v. Giglio,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)." Record vol. 1 at 26. The only agreement disclosed concerning McArthur Fort was that the government had promised to make his cooperation known to the sentencing judge in return for his testimony at trial. The government

**1024**

brought the agreement before the jury on direct examination of Fort. However, on cross-examination by Hope's counsel, Fort admitted that the government had agreed to drop five counts of the indictment in exchange for a plea of guilty to the remaining count, and Agent Mazzilli testified that he also had promised to bring Fort's cooperation to the attention of the court and the government. Hope and Poitier argue that they were denied due process by the government's failure to disclose these agreements and that the district judge should have granted the motion for mistrial on that ground. The government argues that the dropping of five of the charges against Fort was in return for a plea of guilty and not for his testimony at trial; therefore, argues the government, the discovery order was not violated.

Even though there was "a very minimal non-compliance with the standing discovery order," record vol. 3 at 187, the motion for mistrial was correctly denied by the district judge. The existence of the other agreements was before the jury, hence the nondisclosure was harmless error. *United States v. Colyer*, 571 F.2d 941, 948 (5th Cir.1978), *cert. denied*, 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328.

Appellants' arguments that the government actively concealed false testimony and that the prosecutor made improper statements during closing argument are meritless and do not warrant discussion. The convictions are

AFFIRMED.