**UNITED STATES of America,
Plaintiff,**

v.

**Fred C. CHAPMAN, Defendant.**

**No. 74–382–Cr–JLK.**

United States District Court,
S. D. Florida,
Miami Division.

Nov. 20, 1974.

William L. McCulley, Special Atty., U. S. Dept. of Justice, Miami, Fla., for plaintiff.

Walter E. Gwinn, Miami, Fla., for defendant.

## ORDER GRANTING MOTION TO SUPPRESS

JAMES LAWRENCE KING, District Judge.

█ This cause came on for consideration upon the motion of the defendant to suppress evidence obtained through an allegedly unlawful search and seizure, and to exclude the testimony of all witnesses revealed by that search and seizure. The court, having considered the record and being fully advised in the premises, finds and concludes that the motion should be granted.

The facts pertaining to the search and seizure are not in dispute. At approximately four o'clock in the afternoon of October 22, 1966, two officers from the Dade County Public Safety Department responded to a report of a suspected burglary at the Neil McIntyre residence. The neighbor who had contacted the police was a friend of the McIntyre family, and had been told that the McIntyre's would be out of town over the weekend and the house would be unoccupied. Upon seeing three unfamiliar automobiles parked in front of the house, the neighbor called the police and accompanied them to the McIntyre home in the police car.

The McIntyre residence was located in the middle of several acres in a somewhat rural setting, with no immediately adjacent dwellings. When the police arrived at the McIntyre residence, they first knocked at the front door. Receiving no response, they proceeded to go around the house. One officer went to the back, where he met the defendant, Fred C. Chapman, who had come out through a rear door. In response to the officer's inquiries, Chapman identified himself, and named the McIntyre's as the owners of the property. However, when asked who had given him permission to be in the house, Chapman replied, "Kinney" or "McKinney." The neighbor did not know such a person.

During the time when Chapman was engaged in conversation with one officer, the other officer proceeded to the side of the house. He walked through a partially enclosed carport, ascended a few steps, opened the side door and entered the kitchen. Once inside, the policeman observed a gambling operation. He then withdrew from the house and called the other officer. The two policemen conferred briefly, then both entered through the side door. Chapman, in the meantime, had reentered the house through the rear door, met the officers in the kitchen and told them that they could not come into the house. One of the officers replied that they had already been inside.

All the occupants of the house were detained until other police officers arrived. Chapman was then placed under arrest, and the evidence which became the basis for this prosecution was seized.

Two additional facts must be noted. First, Chapman asserts that he paid the McIntyre's one hundred dollars for the temporary use of their residence. Hence, the defendant was lawfully upon

the premises and entitled to an expectation of privacy. Second, the United States acknowledges that the Dade County police had neither an arrest warrant nor a search warrant. Because of the warrantless entry into a private dwelling, Chapman asserts that the search and seizure was in violation of the Fourth Amendment, and that the fruits of the unlawful intrusion must be suppressed.

In an attempt to carry its burden of showing that the search and seizure was within one of the exceptions to the warrant requirement, Williams v. United States, 382 F.2d 48 (5th Cir. 1967), the government argues that there was a need for "quick action," and that the steps taken were reasonable. The government's position is founded on its interpretation of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In that case, the Supreme Court sanctioned an on-the-street surface clothing pat-down by police to discover any hidden weapons of assault. The officers were allowed to "stop and frisk" Terry without probable cause since the circumstances gave rise to reasonable suspicion, and a superficial check for weapons was found to be a "limited" intrusion which was reasonable within the meaning of the Fourth Amendment. The United States now seeks to apply the Terry rationale to the present case on the basis of a decision by the Sixth Circuit, United States v. Langley, 466 F.2d 27 (6th Cir. 1972).

In Langley, as in the case now before the court, the police responded to a reported burglary. There the similarity ends. The police in Langley were called at about four o'clock in the morning when it was still dark. Although the windows of the house were taped shut, the police were able to see moving figures inside. The police knocked at the front door, but no one answered. Parked in front of the house was a large truck which had a vertical door partially open. One of the policemen entered the truck and wrote down the numbers of packing crates found inside.

Based on the information the police obtained from entering onto the premises, peering into the window, and going into the truck, a search warrant was issued. Langley challenged the fruits of the search on the ground that the information in the warrant "had been illegally obtained.

The Sixth Circuit affirmed the district court's denial of the motion to suppress, reasoning that the police acts of going onto the premises and looking into the house and truck were sufficiently limited in scope to fall within the Terry exception to the Fourth Amendment warrant requirement. The court further held, however, that the police went "a step beyond that which was sanctioned by the circumstances" when the officer entered the truck. The use of the numbers from the packing crates was held to be such a minor portion of the information in the supporting affidavit that the warrant was not invalidated.

Against this background, therefore, must be read the language in Langley on which the United States so heavily relies:

We think that such circumstances not only warrant but mandate police action which may involve limited intrusions of the "privacy" of the premises. Here the intrusions on the Langley premises were geared to protect the privacy and security of the premises; they were directed not at Langley or other occupants of the house but rather at suspected burglars.

Id. at 34. (emphasis supplied). The Sixth Circuit, following the example of the Supreme Court in Terry, focused on the limited nature of the police intrusion. In the present case, the police actually entered the private residence. Such an intrusion simply cannot be characterized as "limited." Consequently the government's arguments based on the Terry-Langley rationale must be rejected.

As an alternative basis for justifying the warrantless search, the govern-

ment invokes the "exigent circumstances" exception. *See e. g.*, Chapman v. United States, 365 U.S. 610 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The strongest case cited by the United States for this position is United States v. James, 432 F.2d 303 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2214, 29 L.Ed.2d 682 (1971), in which the Fifth Circuit approved a warrantless search because of the governmental need for quick action. As in nearly every search and seizure case, that holding has meaning only in the context of the specific facts before the court.

In *James*, the object of the challenged search was a wallet. It was taken by the police after James was under lawful arrest. His clothes and personal effects, including the wallet, were also in lawful custody and could have been searched incident to the arrest. Nonetheless, the Fifth Circuit saw a "significant need on the part of the government to justify a warrantless search." *Id.* 432 F.2d at 307. That need was met by the pressing governmental interest of apprehending the other members of a bank robbing conspiracy. The court concluded that "effective law enforcement would have been frustrated if there was *any* delay." *Id.* at 307. (emphasis supplied).

The other cases relied upon by the United States do little to bolster its position. United States v. Halliday, 487 F.2d 1215 (5th Cir. 1973), involved "the classic *Carroll* [v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)] situation, where the vehicle was easily and quickly moveable." *Id.* at 1217. United States v. Green, 474 F.2d 1385 (5th Cir. 1973), cert. denied, 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63, concerned a warrantless entry onto property by a fire inspector immediately after a fire to investigate the cause. In United States v. Sokolow, 450 F.2d 324 (5th Cir. 1971), the final case cited

by the United States for the proposition that the need for prompt governmental action may outweigh the interest of privacy, the Court of Appeals found no exigency sufficient to escape the rule that a search conducted outside the judicial process is *per se* unreasonable in violation of the Fourth Amendment.

In sum, the United States has brought to the court's attention no case in which a similar warrantless police entry onto private property has been excused. The obvious explanation for the deficiency is that this case is one in which conduct of the police cannot be squared with the requirements of the Constitution. In reaching such a conclusion, the court does not impugn the officers' good faith belief that criminal activity was taking place in the McIntyre residence. Rather, the controlling consideration was explained by the Supreme Court, speaking through Mr. Justice Jackson:

> Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Johnson v. United States, *supra*, 333 U.S. at 14, 68 S.Ct. at 369.

The final factor in this court's determination that the warrantless entry was unlawful was the government's candid admission at oral argument that the facts known to the officers probably would not have established probable cause for the issuance of a search warrant. For a court to sanction an intrusion such as this one for the purpose of *investigating* a suspected crime would be to eviscerate the Fourth Amendment. Again, it is appropriate to quote Mr.

Justice Jackson: "If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required." Johnson v. United States, *supra* at 15, 68 S.Ct. at 369.

Chapman argues an alternative basis for granting his motion to suppress. He claims that the police violated both state and federal statutory law by their failure either to announce their authority and purpose, or to await a refusal of admittance before using force to enter the home. F.S.A. § 901.19(1); 18 U.S.C. § 3109. The court is of the view that this contention is also well-founded.

Since the Florida statute and the federal statute appear to be virtually identical in substance, they can be considered jointly. The government makes two basic arguments: first, that the statutes are inapplicable; and second, that non-compliance ought to be excused.

▮ The United States suggests that no "force" was used to gain entry since the door to the kitchen was unlocked. That contention was laid to rest in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), when the Supreme Court held that opening a "closed but unlocked" door was sufficient force to trigger the protection of the statute. Next, the government argues that making the statutorily-prescribed announcements of authority and purpose would have been a "useless gesture." Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). To take advantage of this exception, however, the government must show that "the facts known to the officers would justify them in being virtually certain that the petitioner already knows their purpose . . . ." *Id.* at 310, 78 S.Ct. at 1196. Here, Chapman may fairly be said to have known that the police were investigating the legitimacy of his presence in the McIntyre residence, but it is difficult to attribute to Chapman any knowledge of the officers' purpose in entering the dwelling. Even if Chap-

man could be charged with knowledge that the police were entering the house to arrest burglars, there is no contention that the police were refused admittance prior to entering through the side door. Viewing the facts most favorably to the government, at best it can be said that Chapman saw the officer enter and failed to object. Yet the burden is on the officers either to await a refusal of admittance or to show exigent circumstances which excuse that requirement. *Cf.* Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The government argues that the exigency was that "there was reason to believe that valuables could be carried away." (Plaintiff's memorandum at 9) The case cited in support of that position, United States v. Pratter, 465 F.2d 227 (7th Cir. 1972), recognized only that "[p]rompt action and surprise may be necessary to forestall escape, the destruction of evidence, or even violence." *Id.* at 230–231. *See also*, Ker v. California, *supra* 374 U.S. at 37–41, 83 S.Ct. 1623. The exceptions to section 3109 have been narrowly drawn, and there is nothing in the present factual situation which would excuse compliance with the statutory mandates.