UNITED STATES of America, Plaintiff-Appellee,

v.

Bronzie L. CARTER, Defendant-Appellant.

Nos. 76-2325 and 77-5144.

United States Court of Appeals, Fifth Circuit.

Feb. 3, 1978.

I. Paul Mandelkern, James M. Russ, Orlando, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., A. Thomas Mihok, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before THORNBERRY, Circuit Judge, SKELTON, Senior Judge * and HILL, Circuit Judge.

HILL, Circuit Judge:

After a jury trial, defendant Bronzie Carter was convicted of unlawfully distributing heroin in violation of 21 U.S.C. § 841(a)(1) and of conspiring to distribute heroin in violation of 21 U.S.C. § 846. By order of this Court, the defendant's direct appeal from his convictions has been consolidated on this appeal with the defendant's appeal from the district court's denial of his motion for a new trial. The defendant challenges his convictions on several grounds. We hold that the defendant's allegations of error are meritless, and we affirm.

During the summer and fall of 1975, Agents Goode and Kelsey of the Orlando, Florida, Police Department, working as an undercover team, investigated a three-tier heroin distribution chain. Defendant Carter sold heroin to Terri Ovitt, who then sold the heroin to Anthony Italiano. Goode and Kelsey developed evidence against the defendant and Italiano by making several purchases of heroin from Italiano. Italiano was arrested on the night of October 29, 1975, by agents of the United States Drug Enforcement Agency (DEA). On the same night, DEA agents and local law enforcement officers executed a search warrant at defendant Carter's home and arrested him. During the hearing on the motion to suppress, the parties disputed several important facts concerning the execution of the search warrant. We state and apply the law to the facts as they were found by the district court after the suppression hearing because the district court's findings of fact are supported by the record. *United States v. Johnson*, 327 U.S. 106, 111–12, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

Approximately 16 law enforcement officers executed the search warrant for heroin at the defendant's trailer home. DEA Agent Porter was the first officer to enter the trailer. As he and another officer drove to the trailer, they saw a man standing at the trailer door. The man jumped off the doorstep and ran away from the trailer when he saw the officers approach. Porter then ran toward the trailer and yelled, "Sheriff's Department with a warrant," when he was approximately 15 feet from the trailer. When Porter reached the trailer door, it was slightly ajar. Porter heard someone inside the trailer yell, "It's

* Senior Judge of the United States Court of Claims, sitting by designation.

the cops," and he heard people inside the trailer running away from the door. Porter again announced that he had a warrant from the Sheriff's Department, and he entered the trailer. Porter immediately proceeded to the trailer bathroom, where he found the defendant and another person emptying the contents of a clear plastic bag into the toilet. Porter arrested the defendant. After placing the other trailer occupants under control, Porter and some other officers completed their search of the trailer. Among the items they seized were a triple-beam balance, some glass jars containing lactose, and boxes of tinfoil. The officers also seized traces of heroin that were on the toilet and in the plastic bag the defendant had been emptying into the toilet.

 The defendant argues that Agent Porter's entry into the trailer violated 18 U.S.C. § 3109, which provides that an officer may break open a door of a house to execute a search warrant if "after notice of his authority and purpose, he is refused admittance . . .," because Porter did not give the trailer occupants an opportunity either to open the door or to refuse admittance. The defendant further argues that § 3109 does not have an exigent circumstances exception and that, even if it does, Porter was not confronted with a situation justifying his failure to comply with the statute.

Although the Supreme Court has never expressly held that § 3109 has an exigent circumstances exception, the Court has strongly indicated that it would recognize such an exception on the appropriate fact situation:

> Exceptions to any possible constitutional rule relating to announcement and entry have been recognized . . . and there is little reason why those limited exceptions might not also apply to § 3109, since they existed at common law, of which the statute is a codification.

*Sabbath v. United States*, 391 U.S. 585, 591, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 828 n. 8 (1968).

*See also Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). This Court explicitly has held that compliance with § 3109 may be excused when exigent circumstances exist. *United States v. Chapman*, 384 F.Supp. 1232, 1236 (S.D.Fla. 1974), *aff'd*, 523 F.2d 1054 (5th Cir. 1975); *United States v. Squella-Avendano*, 447 F.2d 575, 584 (5th Cir.), *cert. denied*, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *United States v. Garcia Mendez*, 437 F.2d 85, 86 (5th Cir. 1971).

The defendant argues, however, that this Court should no longer recognize an exigent circumstances exception to § 3109 because Congress repealed the "no-knock" law, 21 U.S.C. § 879(b), which authorized a federal agent in certain situations to execute a search warrant for narcotics without announcing his authority or purpose, and because neither Congress nor the Supreme Court has since engrafted an exigent circumstances exception onto § 3109. We reject this argument. Although the common law exhibits a deep respect for the individual's right to privacy in his home, the common law also permits certain intrusions upon this right. The legislative history accompanying the repeal of the "no-knock" law shows that Congress did not intend that repeal of the law eliminate the common law exceptions to § 3109. In addition to repealing the "no-knock" law, Congress made § 3109 applicable in the District of Columbia. The legislative history states:

> It is the conferees' intent that D.C. police be required to announce their authority and purpose in the same situations in which other Federal law enforcement officers are required to make such announcement. Conversely, they should be excused from compliance with the rule in those situations where other Federal law enforcement officers are excused.
>
> \* \* \* \* \* \*
>
> [T]he conferees were concerned that retention of the [statutory] exception relating to entry by trick or stratagem could lead courts to conclude that no other exceptions are available in the District of Columbia. This was not the conferees'

intent. Conf.Rep. No. 1442, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 5974, 5977–78.

Therefore, this Court still recognizes an exigent circumstances exception to § 3109 despite repeal of the "no-knock" law.

We affirm the district court's holding that Agent Porter's failure to comply with the terms of § 3109 was justified by the exigencies of the situation. In determining the lawfulness of an entry and of the existence of probable cause, a court concerns itself only with what the officers had reason to believe at the time of their entry. *Ker v. California,* 374 U.S. 23, 40–41 n.12, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). In the case on appeal, Agent Porter had reason to believe that the person who ran from the trailer had detected the officers' presence. When Porter reached the trailer, he heard someone inside the trailer announce the officers' presence and the sound of people running away from the door where he stood. These facts justified Porter in being "virtually certain" that the persons inside the trailer knew Porter's purpose and that making the statutorily prescribed announcement of authority and purpose would be a "useless gesture." *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States v. Chapman,* 384 F.Supp. 1232 (S.D.Fla.1974), *aff'd,* 523 F.2d 1054 (5th Cir. 1975); *United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.22d 369 (1971). Finally, Agent Porter was concerned about the possible destruction of evidence; heroin is a readily disposable item. Therefore, the execution of the search warrant was legal.

▇▇▇ The defendant's appeal from the denial of his motion for new trial raises a troublesome issue. The defendant alleges that his constitutional rights to due process and to a fair trial were violated by the Government's alleged failure to reveal material impeachment evidence exclusively in its possession and by the Government's failure to correct allegedly false testimony by Italiano, Agent Goode, and Agent Kelsey. The parties sharply dispute the facts that form the basis for the defendant's argument. Therefore, this Court accepts the facts as found by the district court, because the district court's findings were not "wholly unsupported by [the] evidence." *United States v. Johnson,* 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

Anthony Italiano, the person who sold heroin to Agents Goode and Kelsey of the Orlando, Florida, Police Department, testified as a prosecution witness at trial. Italiano was arrested the same night the defendant was arrested. After Italiano's arrest, John LePore, supervisor for the Orlando DEA unit, advised Italiano that he was charged with seven counts of dispensing heroin and that each violation had a maximum penalty of 15 years. LePore also told Italiano that if he would cooperate with the DEA, including testifying concerning his heroin source, Italiano's cooperation would be reported to the United States Attorney. Italiano subsequently entered into a plea agreement, by which he agreed to provide the Government with information concerning his heroin source. In December 1975, however, Italiano renounced the plea agreement. Assistant United States Attorney Thomas Mihok then told Italiano that Mihok would urge the trial court to impose the maximum sentence of incarceration if Italiano was convicted. Subsequent to the collapse of the plea agreement, Italiano was convicted on all seven counts against him.

During debriefings under the aborted plea agreement, Agent Kelsey had told Italiano that he would advise the trial court and the United States Attorney of Italiano's cooperation if Italiano would testify at the Carter trial. Three days before the Carter trial, Agent Goode promised Italiano that Goode would inform Italiano's sentencing judge of Italiano's cooperation. The district court found that affirmative promises were not made to Italiano concerning protection for his family and for himself until after the conclusion of Italiano's testimony in the Carter case. The court also found that, after Italiano's arrest on October 29, 1975, he worked as a confidential informant for Goode to provide him with

information on matters unrelated to the Carter case.

During the Carter trial, the defense counsel asked Italiano whether he had ever been offered anything in return for his testimony. Italiano responded that he had not. In response to further questioning by the defense counsel, however, Italiano testified that he had been convicted of selling heroin to Agents Goode and Kelsey and that he thought "it might go lighter on [him]" if he testified against Carter. Italiano further testified that neither Goode nor Kelsey promised him anything for testifying against Carter but that they had suggested to him that they would "help [him] out" if he did so. Agent Goode testified on cross-examination that he had never approached Italiano about a possible deal in exchange for his testimony and that Goode had never been with Kelsey when Kelsey had done so. Agent Kelsey testified on cross-examination that he had never made any "overtures" to Italiano about what Kelsey might be able to do for him if he testified against Carter.

After Carter's trial, Italiano gave a sworn statement to Carter's attorney in which he asserted that he had testified against Carter because he had been coerced and threatened by the Government's counsel and by DEA agents and because he had been offered inducements and lenient treatment in return for his testimony. Carter's attorney then filed a motion for new trial in the district court. After the hearing on the motion, the district court found that the only promises Italiano had received before trial were that Agent Goode would advise Italiano's sentencing judge of Italiano's cooperation and that DEA Supervisor LePore would notify the Assistant United States Attorney of Italiano's cooperation. The district court denied the defendant's motion for new trial, holding that there was no reasonable likelihood that the jury verdict would have been affected by disclosure of the information that was the subject of the motion.

Examination of the entire line of Italiano's cross-examination concerning his possible bias shows that Italiano apprised the jury that he expected to benefit by testifying against Carter. The Government argues that Goode's and Kelsey's testimonies also were truthful. The Government argues that Goode's testimony was truthful because Italiano allegedly approached Goode, whereas the defense counsel only asked whether Goode had ever approached Italiano. Additionally, the Government argues that Goode's promise to Italiano was not offered in exchange for Italiano's testimony because Goode made this promise after Italiano already had agreed to testify and because Goode would have been morally obliged to inform Italiano's sentencing judge about Italiano's informant work regardless of whether Italiano testified voluntarily at the Carter trial. The Government argues that Kelsey's trial testimony was truthful because Kelsey testified at the hearing on the motion for new trial that he interpreted the word "overture" in the defense counsel's question to mean "undue pressure, coercion, harassment, promises, anything [he] couldn't fulfill, or deceive [Italiano] in any way."

We do not determine whether Agent Goode's and Agent Kelsey's testimonies were perjurious or nonperjurious in the strict legal definition of perjury. The Government's argument that Goode's and Kelsey's testimonies were truthful depends more upon criticism of the questions put to them than upon candor on the part of these witnesses. The Agents did not candidly respond to the defense counsel's questions, and the prosecuting attorney did nothing to correct the Agents' evasive testimonies. *See Blankenship v. Estelle*, 545 F.2d 510 (5th Cir. 1977); *Dupart v. United States*, 541 F.2d 1148 (5th Cir. 1976). Therefore, for purposes of this case, we review the Agents' testimonies in light of the stringent standard stated in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Giglio*, the Supreme Court held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's judgment. *See also Napue v. Illinois*, 360 U.S. 264, 79

S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Applying that standard, we affirm the district court's holding. Although Agents Goode and Kelsey did not reveal that they had attempted to induce Italiano to testify against the defendant, Italiano himself apprised the jury that he expected to benefit by testifying and that Agents Goode and Kelsey had suggested to him that it would be in his best interest to do so. There was sufficient evidence at trial establishing the defendant's guilt that this Court cannot conclude that more candid disclosure by witnesses Goode and Kelsey would have been reasonably likely to have affected the verdict. Italiano testified that he had direct dealings with the defendant in connection with the procurement of heroin. When testifying at the hearing on the defendant's motion for new trial, Italiano did not refute any of his trial testimony concerning the defendant's guilt. Italiano's trial testimony was corroborated by the testimony of Terri Ovitt, who was shown by the evidence to be the middleman through whom the defendant distributed heroin to Italiano. Furthermore, Italiano's and Ovitt's testimonies were corroborated by surveillance agents and by the search of the defendant's residence.

Finally, the testimony of the defendant's trial counsel, Ed Leinster, at the hearing on the motion for new trial shows that from the time Italiano's plea bargain collapsed until shortly before trial, Italiano kept Leinster informed about any and all "pressures" being exerted on Italiano to testify against Carter. Leinster testified that he had discussed with Italiano the plea negotiations between Italiano and the Government. Leinster also testified that he knew that Agents Goode and Kelsey were attempting to induce Italiano to testify by giving him general assurances that they would try to do something for him and by telling Italiano that they could make things easy or hard for him. During the Carter trial, Leinster examined the attorney who represented Italiano in the plea negotiations about the aborted plea bargain. On cross-examination, Leinster elicited from Italiano that he expected to benefit by testifying. The jurors were made aware of any expectations on the part of Italiano which might have motivated him as a witness. We affirm the district court's denial of the motion for new trial.

Although we affirm the district court's holding, we condemn the Government's use of misleading testimony. The due process clause of the fifth amendment mandates that each defendant shall receive a fair trial. Although the Government has an obligation to prosecute cases zealously, the Government's primary obligation is to try each case fairly and with due regard for the accused's rights. The witnesses yielded to a temptation to evade; the Government's counsel ought not have done so.

■ Citing this Court's decision in *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), the defendant next argues that the trial judge committed reversible error by failing to give a cautionary instruction to the jury that out-of-court statements made by a coconspirator are inadmissible against the defendant until the conspiracy is established by nonhearsay testimony. Specifically, the defendant objects to Agents Goode's and Kelsey's testimonies concerning out-of-court conversations they had with Italiano. Although the defense counsel objected to this testimony on the basis that it constituted hearsay, he did not request a limiting instruction either when the statements were admitted during trial or during the jury charge. Therefore, the trial court's failure to give the limiting instruction sua sponte is reversible error only if it constitutes plain error affecting substantial rights. Fed.R.Crim.P. 52(b); *United States v. Garcia*, 531 F.2d 1303, 1307 (5th Cir.), *cert. denied*, 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976); *United States v. Fendley*, 522 F.2d 181, 186 (5th Cir. 1975).

In *Apollo*, the trial court refused to give a limiting instruction though the defense counsel promptly objected to the introduction of certain hearsay testimony without a proper cautionary instruction. This Court stated that the record in *Apollo* was "replete with . . . extra-judicial statements" and that the trial court permitted

"a veritable flood" of hearsay testimony. 476 F.2d at 163. Although the trial court in *Apollo* did give an appropriate instruction in its jury charge, the court stated in the jury's presence that "connection with conspiracy must of necessity be established by some hearsay in this kind of case."

This Court has held that although *Apollo* may establish that a cautionary instruction must be given if properly requested, *Apollo* does not require an instruction when one is not requested unless manifest prejudice would result otherwise. *United States v. Moore*, 505 F.2d 620, 624 (5th Cir. 1974). Therefore, whether the holding in *Apollo* requires reversal in a particular case depends on the facts in that case. *United States v. Jennings*, 527 F.2d 862, 868 (5th Cir. 1976). During the trial of the case on appeal, the trial court specifically found that there was sufficient evidence that a conspiracy existed between the defendant and Italiano as of September 26, 1975. Therefore, the trial judge sustained the defendant's hearsay objections as to out-of-court statements made by Italiano before that date but permitted testimony concerning Italiano's out-of-court statements after that date.

We find that the existence of a heroin distribution conspiracy involving the defendant was established by nonhearsay evidence. Coconspirator Ovitt testified, for example, that she would call the defendant for heroin and that the heroin then would be left at her trailer. Italiano then would pick up the heroin and pay her, at which time she would call the defendant. The defendant then would come to Ovitt's trailer to pick up the money. Therefore, the trial court did not commit plain error by failing to give a limiting instruction concerning the hearsay testimony.

■ The defendant's remaining objections may be disposed of with little discussion. When the trial judge read count two of the indictment to the jury, he instructed them that he would not read overt acts one through ten because there was no evidence to support them. The defendant alleges that the trial court thereby committed a reversible error because it implied that there was evidence to support the other overt acts alleged in count two of the indictment. Because the defendant did not object to this instruction at trial, this Court will reverse the district court on the basis of this objection only if it constituted plain error affecting substantial rights. Fed.R. Crim.P. 52(b); *United States v. Garcia*, 531 F.2d 1303, 1307 (5th Cir.), *cert. denied*, 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976); *United States v. Fendley*, 522 F.2d 181, 186 (5th Cir. 1975). The Supreme Court and this Court have held that withdrawing from the jury's consideration a part of the indictment unsupported by the evidence is permissible. *United States v. Ballard*, 322 U.S. 78, 90–91, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (Stone, C. J., dissenting); *United States v. Musgrave*, 483 F.2d 327, 338 (5th Cir. 1973); *Overstreet v. United States*, 321 F.2d 459, 461 (5th Cir. 1963); Wright, Federal Practice and Procedure § 127 (1969). In the case on appeal, the trial judge's statement concerning overt acts one through ten did not prejudice the defendant. We hold that the trial judge's statement did not constitute error, much less plain error.

The defendant next argues that the trial court committed reversible error when it gave the jury a supplemental charge commonly known as an *Allen* charge. This allegation of error is meritless, because the trial court's charge was within the limits of *United States v. Bailey*, 468 F.2d 652 (1972), *aff'd en banc*, 480 F.2d 518 (5th Cir. 1973). *United States v. Atkins*, 528 F.2d 1352, 1359–60 (5th Cir. 1976).

■ Finally, the defendant argues that he was denied the effective assistance of counsel because his trial counsel did not request a jury instruction concerning the limited use of hearsay testimony in a conspiracy trial. In determining whether a defendant has been afforded the effective assistance of counsel, this Court applies the standard of "reasonably effective assistance." *Loftis v. Estelle*, 515 F.2d 872, 875 (5th Cir. 1975); *Herring v. Estelle*, 491 F.2d 125, 128 (5th Cir. 1974). This standard does

not require errorless counsel. *MacKenna v. Ellis*, 280 F.2d 592 (5th Cir. 1960), *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). In the case on appeal, the defendant's trial counsel satisfied this Court's standard. Among other actions, he filed pretrial motions to dismiss, to suppress, and for a bill of particulars; he cross-examined coconspirators Ovitt and Italiano and elicited information concerning their possible bias in favor of the Government; and he made several objections to the use of hearsay testimony. Therefore, the mere failure of the defendant's trial counsel to request limiting instructions on the use of a coconspirator's out-of-court statements is insufficient on the facts of the case on appeal to support a charge of ineffective assistance.

AFFIRMED.

SKELTON, Senior Judge, specially concurring:

I am concerned about the failure of the officers who made the search of defendant's house to comply with 18 U.S.C. § 3109, which authorizes an officer to break open a house when executing a search warrant only if after notice of his authority and purpose he is refused admittance.[1]

It is undisputed that the officers broke into the house by entering an unlocked door that was closed except for a space of 2 or 3 inches without knocking and without waiting any time at all to be admitted or denied admittance by the defendant or the other persons inside of the house. The trial judge found that there was no "literal compliance with 18 U.S.C. 3109," but approved the breaking in because he found that exigent circumstances justified the failure of the officers to comply with the statute.

In my opinion, it is highly doubtful whether exigent circumstances existed that excused the officers from complying with § 3109. The most that could be said would be that it is a very close question.

The record shows that before the officers broke into the house they did not have any information other than probable cause used to procure the search warrant that heroin was in the house, nor did they see any heroin inside before they entered the house. They were plainly on a fishing expedition seeking to find heroin in the house, but not knowing whether it was there.

The facts show further that defendant's house was a trailer house that was located at the end of a street and adjacent to a nursery operated by the defendant. For an automobile to reach the house, it must come over a hill a short distance down the road. On the night of the search, defendant's brother, Earl Carter, had been regulating the thermostats in the nursery and was washing his hands while outside the house and near the front door when he saw headlights of a number of automobiles coming over the hill toward the house with their motors running so fast they sounded like they were in a "drag race." When they got within 20 feet of Earl, he thought they were going to run over him, so he ran to the side of the house. He did not say anything to the occupants of the house. After the cars stopped, he did not hear the officers announce their authority or purpose. In fact, he did not knew they were police officers, as they were in unmarked cars, were not in uniform, and one or more of them had long hair.

The record shows further that fifteen to twenty officers participated in the search. They arrived at defendant's house on the night in question in four to six cars. The cars in front stopped 15 or 20 feet from the house, and the officers jumped out and hit the ground running as fast as they could toward the front door of the house. Officer Porter testified that when he was about 15 feet from the house he yelled "Sheriff's Department with a search warrant" and he repeated this statement when he reached

1. Title 18 U.S.C. § 3109 provides:

"§ 3109. Breaking doors or windows for entry or exit.

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

the door of the house. When he got to the door, he did not knock nor even hesitate, but abruptly pushed the door open and entered with a pistol in his hand. He testified that before he entered the house he heard footsteps inside the house that sounded to him like someone was running down the hall of the house. He also said he heard someone inside the house yell "It's the cops."

Agent Wood testified that he jumped from his car and yelled "Federal agents, this is a search warrant," and then ran to the front door of the house where he again yelled "Federal agents, search warrant." Before entering the house, he said he heard the sound of people "running and scurrying around inside" and heard someone yell "Run, it is the cops." Although Agent Porter had entered the house just ahead of him, Wood had to open the door again as there was an automatic closing device on the door. He entered the house through the door without knocking and without waiting any time at all. In the meantime, the other officers either went inside the house behind Porter and Wood or surrounded the house, some of whom broke sliding plate glass doors with a sledge hammer. The trial judge found that the breaking of these glass door was a "needless act of destruction."

There were seven people inside the house, including the defendant, when the breaking-in occurred. Two of these persons were women. All but the defendant were in the living room listening to the television program of Johnny Carson. Five of these persons testified that none of them yelled "It's the cops" before the officers entered the house, and none of them heard the officers announce their authority or purpose before officer Porter charged into the house with a gun in his hand. After the occupants of the house were secured and forced by the officers to lay on the floor with their hands behind their backs, including the women, and with the officers' feet on their necks and guns pointed at their heads, one of the officers read the search warrant aloud. Until this was done, the people in the house did not know the intruders were police officers and thought they were robbers. As stated above, the officers were not in uniform and one or more of them had long hair.

I now consider whether the above facts show exigent circumstances that justified the breaking-in without compliance with § 3109. The statute does not provide for exceptions nor for non-compliance because of exigent circumstances. However, the courts have recognized that exigent circumstances may excuse non-compliance. The officers were, of course, aware that heroin can be easily and quickly disposed of, but this alone is not a sufficient reason for their failure to comply with § 3109.

Before the cars stopped about 15 or 20 feet from the house and before the officers jumped from the cars and announced their authority and purpose, they saw Earl Carter run from the front of the house around to the back. They did not hear him say anything and he denied that he did so. His running from the front of the house was explained by him as an act to keep from being run over by the cars of the officers. In any event, his running around the house before the officers jumped from their cars and announced their authority and purpose was an ambiguous act and was not an exigent circumstance. See *Miller v. United States*, 357 U.S. 301, 311, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

A critical issue on exigent circumstances is whether officers Porter and Wood heard footsteps or the sound of a person or persons running in the hall of the house *before* they broke into the house. This is especially true as to officer Porter who was the first one to break into the house. Human experience would indicate that under the facts it is highly doubtful that the officers heard any footsteps in the hall of the house before they entered. As pointed out above, Porter and Wood were in the lead cars. It is obvious that when they jumped from their cars the other cars were approaching with their motors running at high speeds and making a lot of noise. Both officers ran as fast as they could the 15 or 20 feet to

the house, which was logically no more than four or five steps for a running man who is trying to cover the distance in a hurry. While they ran, each of them yelled their authority and purpose twice, or four times by both of them, between the time they left the cars and reached the front door. Also, the other officers were leaving their cars and running with Porter and Wood to the house with the attendant noise of their own footsteps. Furthermore, the TV set was showing the Johnny Carson show in the living room into which the front door opens, with the usual noise of a TV set. To believe, with the noise of the cars, the noise of the footsteps of Porter and Wood, the noise of the footsteps of the other officers, the noise of Porter and Wood yelling their authority and purpose four times while taking four or five steps, plus the noise of the TV set inside the house opposite the front door, that officers Porter and Wood heard footsteps running down the hall of the trailer house, *before* they broke into the front door without knocking and while running at full speed, puts a severe strain on one's credulity. However, the trial judge found that Porter did hear the footsteps and running down the hall when he arrived at the door. While we are bound by his finding, there is a serious question, in my opinion, whether this finding is supported by substantial evidence.

The occupants of the house denied that anyone ran down the hall *before* officer Porter entered the house. They testified that *after* he burst through the front door with gun in hand, they were scared and thought he was a robber and two of them, including defendant's pregnant wife, ran to the back of the trailer. Their running at this point in time could not constitute an exigent circumstance that would excuse compliance with § 3109, because it occurred after, and not before the breaking-in by officer Porter.

Officer Porter testified that he had participated in "a few hundred searches," and that he knew the requirements of entering a house unannounced. This testimony shows that he knew that if he heard noises that he could conclude were footsteps or

running before he entered the house, he could contend that exigent circumstances existed that would excuse compliance with § 3109. With this background, it is no surprise that his hearing was so acute that he could hear footsteps and running inside the house above the din, commotion, and noises described above, before he broke into the house while running at full speed. Such testimony appears, at least to me, to be incredible.

If it could be assumed under the facts existing at the time and place in question that it was impossible for officer Porter to have heard a noise before the break-in that sounded to him like people running down the hall of the trailer, the only other exigent circumstance was Porter's statement that when he arrived at the door he heard someone inside yelling "It's the cops." The occupants of the house denied that anyone made such a statement, but the trial judge found otherwise. An analysis of the cases and of the statute reveals that there are two prongs to the announcement that officers must make before breaking into a house, namely, (1) that they are police officers, and (2) their purpose in being there. Both requirements of the statute must be met and compliance with only one will not suffice. The Supreme Court stated in *Miller v. United States, supra*:

> "The requirement of prior notice of authority *and* purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. ___ The petitioner could not be lawfully arrested in his home by officers breaking in without first giving him notice of their authority *and* purpose. Because the petitioner did not receive that notice before the officers broke the door to invade his home, the arrest was unlawful, and the evidence seized should have been suppressed." (357 U.S. 313–314, 78 S.Ct. 1198). (Emphasis supplied.)

Also, see *Sabbath v. United States*, 391 U.S. 585, 589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) where the court quoted the above statement with approval, and stated further:

"___ [T] his record does not reveal any substantial basis for excusing the failure of the agents here to announce their authority *and* purpose." (391 U.S. 591, 88 S.Ct. 1759). (Emphasis supplied.)

It is argued that since someone inside the house yelled "It's the cops," the occupants of the house knew the authority and purpose of the officers and that it would have been a "useless gesture" for the officers to make the announcement as to their authority and purpose. This may be true as to the *authority* of the officers, but not so as to their *purpose.* There is nothing in the record to show that the occupants of the house knew the purpose of the officers in being at the house prior to the breaking-in, nor is there any evidence that justified officer Porter in being "virtually certain" they had this knowledge.

The leading case with regard to the "useless gesture" exception is *Miller v. United States, supra.* In *Miller,* Justice Brennan stated:

"It may be that, without an express announcement of *purpose,* the facts known to officers would justify them in being *virtually certain* that the petitioner already knows their *purpose* so that an announcement would be a useless gesture." (357 U.S. 309, 78 S.Ct. 1196) (Emphasis supplied.)

This Court, in *United States v. Chapman,* 523 F.2d 1054 (5th Cir. 1975), affirmed a district court opinion, *United States v. Chapman,* 384 F.Supp. 1232 (1974), which held:

"Next, the government argues that making the statutorily-prescribed announcements of authority *and* purpose would have been a 'useless gesture.' *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). To take advantage of this exception, however, the government must show that 'the facts known to the officers would justify them in being *virtually certain* that the petitioner already knows their *purpose . . .*' Id. at 310, 78 S.Ct. at 1196." (384 F.Supp. 1236) (Emphasis supplied).

Furthermore, this Court stated in *United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir. 1971),

"According to *Miller v. United States,* to justify the breaking it must appear either that the agents did in fact announce their *purpose* or that facts known to them before the breaking 'would justify them in being *virtually certain* that [the occupants] already [knew] their *purpose* so that an announcement would [have been] a useless gesture.'" (447 F.2d 584) (Emphasis supplied) (Brackets in text).

In the instant case, instead of officer Porter being justified by the facts in being "virtually certain" that the occupants already knew his purpose so that an announcement would have been a useless gesture, it appears, at least to me, that when he broke through the door running at full speed and without hesitating, it was virtually impossible for him to be certain that the occupants knew his purpose even if they knew his authority.

Finally, Officer Porter's concern about the possible destruction of heroin which he suspected was in the house, was not enough to constitute an exigent circumstance, without more, that would justify his breaking into the house without complying with § 3109.

I feel that some comment should be made about the acts and conduct of the officers after they broke into the house. The record shows that they forced the occupants of the house to lay face down on the living room floor with their hands behind their backs. The officers then placed their feet on the necks of the occupants, including the neck of one woman, all the while cursing them and abusing them with vulgar and obscene language and threatening to blow their heads off with pistols, rifles, and shotguns pointed at them. The plate glass sliding doors were then broken with a sledge hammer by some of the officers, shattering glass on top of the people on the floor and also overturning a stereo player, bookshelves, and a reel-to-reel set on top of them. The officers then forced the occupants to go

outside the house and kneel on the ground. They were then handcuffed with their hands behind their backs. The occupants were not armed and at no time offered any resistance. None of them, except the defendant, were ever charged, indicted, or tried for any wrongdoing whatever, nor were they shown to have been connected in any way with the illicit drug traffic. In the meantime, the officers tore away part of the trailer, ripped out the commode and dug up a section of sewer pipe, which they carried away.

This conduct was an arrogant and flagrant abuse of their authority. Their acts were reprehensible and should be condemned. No citizen of this country who has committed no crime and offers no resistance should be subjected to the abuse and treatment the occupants of the house received at the hands of these officers. Such conduct breeds contempt and disrespect for the law and hatred for law enforcement officers. I could not let this part of the case go unnoticed without expressing my strong disapproval of these acts of the officers that were never denied nor disputed by them, and on which the court made no findings. While the conduct of the officers after the breaking-in shed no light on the issue of exigent circumstances existing before the breaking-in, nevertheless, it should have had an effect on the trial judge as to their credibility on that issue.

In my opinion, there is only slight evidence of doubtful character in the record that supports the finding of the trial judge that exigent circumstances existed prior to the breaking-in of defendant's house by officer Porter which excused his compliance with § 3109. Nevertheless, he made such finding and I am bound by it. For that reason alone, I reluctantly concur with the opinion of the court on that phase of the case. I find no fault with the remainder of the court's opinion and agree with it.

Our opinion as to the breaking in of defendant's house by officer Porter, without compliance with § 3109, should be regarded as being limited to the very narrow finding of exigent circumstances by the trial judge, and my concurrence on that issue is certainly so limited. I agree with the following statement of Judge Burger (now the Chief Justice) in *Masiello v. United States*, 115 U.S.App.D.C. 57, 317 F.2d 121, 123 (1963), which was a case very similar to the instant case in many respects:

"It would be a grave error to construe what we have said to mean that we are disposed to sustain all speedy entries and searches which are forcibly executed. Quite the contrary. We do so here only on the narrow grounds revealed by this record. Our concern with the importance of compliance with § 3109 is demonstrated by our earlier remand [5] for the hearing

"[5] It would not seem too much to expect that officers engaged in executing a search warrant take some note of the time when notice is given and the time when a break-in occurs. This can easily be done with an ordinary watch."

now under review; close cases such as this will always receive careful appellate scrutiny."

Accordingly, our opinion should not be understood as carte blanche authority for police officers to break into a private residence without complying with § 3109 every time they suspect that illegal drugs may be found in the house and which they fear may be destroyed unless they make a speedy entry. Non-compliance cases such as this will always be carefully scrutinized by this court.