IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,291






EX PARTE JUAN MANUEL CHAVEZ, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. 639093 IN THE 174TH DISTRICT COURT


FROM HARRIS COUNTY






 Keasler, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Price, Johnson, Hervey, Holcomb, and Cochran, JJ., joined. Womack, J.,
dissented.



O P I N I O N


 Juan Manuel Chavez seeks habeas corpus relief, claiming that a State witness's
testimony--that an unknown hair found where the victim was sexually assaulted was
consistent with his known head-hair sample--is false based on recent DNA testing excluding
him as the source of the hair. Contrary to the trial judge's findings and conclusions, we find
no due process violation and deny relief. 

Background

 On May 12, 1992, Lilia Martinez walked from her apartment in Southwest Houston
to a nearby Apple Tree grocery store. She observed a man walking on the opposite side of
the street but in the same direction. Martinez entered Apple Tree, purchased some fruit and
a money order and left the store. As she began to walk back home, she noticed the same man
standing in the corner of the Apple Tree parking lot. The man approached Martinez and
offered to carry her bags. She declined, but the man was persistent; he followed her and kept
talking to her, making some sexually-explicit comments. When they reached her apartment
building, he followed her up a set of stairs while continuing to offer to carry her bags. 
Although the man was wearing dark sunglasses, Martinez got a good look at his face.

 The man followed Martinez and was two units from Martinez's apartment when
Martinez went inside. She immediately locked the door, put her bags down, and looked
through her window. Martinez saw the man standing near her apartment door. She went to
the kitchen, put the fruit in her refrigerator, and then went back to the window and looked
out again. She did not see the man. Martinez went to the building's office and paid her rent. 
Because the man appeared to be gone, she thought that the coast was clear and left her door
unlocked. When she returned to her apartment, she locked the door behind her. As she
entered her bedroom, the man who followed her home stepped out of her closet. Martinez
screamed and ran, but before she could get out of her apartment, the man knocked her to the
floor.

 While Martinez was on the floor, the man covered her mouth with his hand, pulled
a gun from his waistband, pointed it at her head, and told her to shut up or he would "blow
[her] away." With the gun in his left hand, the man undressed Martinez with his right hand. 
As Martinez was laying on her back, the man forced her to preform oral sex on him. During
all of this, even though the man was still wearing sunglasses, Martinez was close to him and
able to get a clear look at him. Next, the man stood Martinez up and walked her into the
bedroom. At this time, he was covering her mouth with his hand, and she was able to see a
worn off, bluish tattoo near his wrist. Once in the bedroom, the man anally sodomized
Martinez. When the man was finished, he wanted to clean himself with the bedspread. 
Martinez pleaded for him not to, so he used toilet paper instead. Martinez testified that she
saw blood on his penis. The man took a towel from the bathroom and used it to clean the
doorknobs. The man then left. 

 Later that day, Martinez told a friend what happened. The friend, Marta Ibarra,
persuaded Martinez to notify the police. An ambulance arrived and transported her to Ben
Taub Hospital. Martinez underwent a full rape examination and spoke to a police officer. 
The nurses and doctors who preformed the exam concluded that Martinez exhibited signs
indicating that she had in fact been raped. 

 Less than twenty-four hours after the assault, Officer Keith Webb, a member of the
Houston Police Department's (HPD) Crime Scene Unit, conducted the primary investigation
of Martinez's apartment. Officer Webb started by taking photographs of Martinez's
apartment. He noticed a stain on the bedspread, where the second assault had taken place. 
He processed the bedspread and moved on to the southwest area of the living room, where
Martinez was first assaulted. Officer Webb used multiple tape lifts to gather trace evidence
like hair and fibers. When he stuck the tape to the floor and pulled it up, the tape picked up
trace evidence, but he performed no actual inspection of it. Officer Webb forwarded the tape
lifts for analysis by a criminalist at the HPD crime lab.

 In the few days after the assault, Martinez inspected a photo array that did not contain
a photograph of Chavez; Martinez did not make an identification from the array. Less than
one month after the assault, Sergeant Angeli of the Houston Police Department asked
Martinez to describe her assailant to a sketch artist. Because Martinez's assailant was
wearing dark sunglasses during the assault, the sketch artist was forced to draw in her own
version of the assailant's eyes. The description Martinez gave to the sketch artist did,
however, include a thin scar on the man's right cheek, which was later determined to be
consistent with a scar on Chavez's right cheek. Martinez also described her assailant as
having "curly hair," a description she testified to at trial. In June 1992, a month after her
assault, Martinez was shown a second photo array. This array did not contain a photograph
of Chavez, and Martinez did not make an identification from this array. 

 Martinez saw her assailant in public on two occasions. First, in early June 1992, while
Martinez and Ibarra were riding a city bus, Martinez recognized a passenger as the man who
assaulted her. Both women noticed the man attempting to hide himself behind two other
passengers. Martinez saw him a second time on June 19, 1992, while shopping with her
brother and Ibarra in a Fiesta Mart. The man walked by Martinez and turned to look at her
twice. Martinez signaled Ibarra, and Ibarra immediately found an off-duty police officer,
Officer Goode, who was moonlighting as a Fiesta security guard. At the same time, Martinez
found another Fiesta security guard and told him what was going on. The security guard that
Martinez alerted testified that the man pointed out to him was acting odd and appeared to be
in a hurry. As soon as the man walked out of the store, Officer Goode asked him to stop. 
He stopped, and Officer Goode took him into custody. Officer Good identified the man as
Juan Manuel Chavez. 

 In mid-August 1992, Martinez viewed a live lineup and immediately identified
Chavez as her assailant. Chavez was then charged with two counts of aggravated sexual
assault. 

 During trial, the State and Chavez's attorney both pointed out the scar that Martinez
saw on her assailant's face--and Martinez again confirmed seeing it during her assault. And
when the prosecutor asked Martinez who assaulted her, she identified Chavez. 

 Deborah Lind, an HPD criminalist who had examined the tape lifts gathered by
Officer Webb, testified about her examination:

 Q. At my request, did you examine some hairs for this particular case?

 A. Yes, I did.

 Q. And what lab number did you assign that, your analysis?

 A. The lab number that was assigned to this case is L 92-8576.

 Q. Now, let me show you what's been marked as State's Exhibit No. 32. Did
you retrieve these tape lifts that were submitted to the [evidence] room by
officer Webb at my request?

 A. Yes, I did.

 Q. And let me show you what's been marked as State's Exhibit No. 33 and No.
34. Are those pulled head hairs from the defendant in this case, Juan Chavez?

 A. Pulled head and pulled pubic.

 Q. All right. Now, after you retrieved the contents of State's Exhibit No. 32,
which are the tape lifts with the various fibers and hairs attached to it, what did
you do with those tape lifts?

 A. After this was received, I then removed the hairs from the tape lifts and I
compared these hairs with the known hairs of Mr. Chavez and to the known
hairs of the complainant. 

 Q. Okay. Now, when you say you removed the hairs from the tape lifts, what
is the first thing you did with those hairs that you removed from the tape lift?

 A. Well, after I removed them from the tape lift, I examined them and I looked
at them under a stereo microscope, which, in essence, magnifies them. 

 Q. Did you mount them on any particular slide or anything like that?

 A. Yes. The next process after examining them, you would mount them on
slides. They're a larger type slide than the normal type microscope slide, more
of a rectangular shape. We call them hair slides and they're mounted and then
I can look at them under a comparison scope.

 Q. Did you mount the known hairs from the defendant as well?

 A. Yes, I did.

 Q. Is that both the head hairs and the pubic hairs?

 A. Yes, I did. 

 Q. Is there a visible difference that you can tell between head hairs and pubic
hairs?

 A. Usually, yes, there is.

 Q. Okay. In this particular case, could you distinguish between the head hairs
and the pubic hairs?

 A. Yes, I could.

 Q. Now, you said that you compared them. Or you compared the hairs that
you took from the tape lifts and the defendant's hairs. What exactly were you
looking for when you compare them?

 A. All right. I examined Mr. Chavez's head and pubic hair and I examined, of
course, the hairs from the evidential tape. What you look at are characteristics
that are similar, both that are found in the hairs from the defendant and in the
hairs that were found on the tape lifts. At the same time, though, I am also,
during this process, I must compare the hairs to the complainant's hairs in
order to do a complete comparative analysis.

 Q. Okay. Were you able to eliminate some hairs that were found on the tape
lift as being Mr. Chavez's?

 A. There were hairs on the tape lifts that were not Mr. Chavez's; this is true.

 Q. You can tell that for sure by your examination?

 A. Yes.

 Q. Now, did you find any hairs that were consistent, any hairs on the tape lift
that were consistent with the known hair from Mr. Chavez?

 A. Yes, I did.

 Q. And can you explain your findings?

 A. Yes. I found one head hair on the tape lifts that was consistent with the
known head hair sample of Juan Chavez. 

 Q. And can you explain what you mean - - what is it that you looked at that
made you reach your conclusion?

 A. Well, when you examine hairs, it's a slow, tedious, long process because
you have to look at, from the root, to the tip of all the hairs. You examine the
spectrum of the hairs received from the defendant and from the complainant. 
So, you have to study their hair separately. Then you must study the hairs
found on the evidence, such as the tape lift. Then when I find two hairs that,
first off, they have to be from the same type of body area, which is the head,
in this case. I look, are they from the same race or similar racial
characteristics, which they were. Then I look at color, the length, what the tip
looked like and I looked at the various anatomical features of the hairs and
compare these features and come to some conclusion.

 Q. What anatomical features were you looking at in this particular case?

 A. Well, all hairs have the same type of anatomical features in the sense that
there are three parts of a hair. 

 Q. What are those?

 A. The three parts of a hair, there is the cortex, which is the outer layer of the
hair. The inner layer, next to that, is called - - excuse me. Is the cuticle is the
outer layer. The inner layer of that is the cortex where the pigment is found. 
The inner area of that is the medulla, which is more like an air type sack
running the course of the hair. You could think of a hair in two different ways. 
Either you could think of a pencil where the yellow covering on the outside of
the pencil is the cuticle and the wooden porous part is the pigment and the
black graphite running through the core of it is the medulla. Or under the
microscope, it looks really more like a road where the cuticle is the shoulder
of the road and the pavement, the black pavement is the cortex with the
pigment and the wave - - the pavement markers that divide the road into lanes
is your medulla.

 Q. Now, when you compared the hair that you found on the trace - - I mean,
on the tape lift to Mr. Chavez's hair, the hair that you said was consistent, what
exactly was consistent? What were the same in the two hairs that you looked
at?

 A. Well, there was many things that were consistent. The length was in the
same area as his. The coloring of the unknown hair and Mr. Chavez's hair
were very, very close. The color pattern, the way the pigment was distributed
down the root to the shaft, to the tip of the hair was very similar. The diameter
of the hair was very similar. The amount of cuticle, the size of the cuticle, the
color of the cuticle was very similar. I looked at type of coloring distribution,
sometimes in some of peoples' hairs there's like a patchy type coloring
distribution and this was similar in Mr. Chavez's hair. 

 Q. Is that the pigment that you're talking about?

 A. Yes, yes, it is. 

 Q. Okay. What about the hair color variation, the shading of the hair color? 
Was that similar as well?

 A. Yes. The coloring was very important and similar to Mr. Chavez's.

 Q. Okay. And the density of the pigment? Did you compare that?

 A. Yes. These are all naturally examined under the comparison scope and
we're looking at the hairs side by side and moving the stages so that you're
looking at both hairs at the same time, the unknown hair on one stage and the
known hairs on the other. And so, therefore, you can study the hairs together
as you're examining the color, as I've said, and the cuticle, the cortex and the
medulla. 

 Q. Now, did you observe a root on the hair that was given to you on the tape
lift?

 A. Yes. When I do analysis, I only really study those hairs that have roots. So,
those are the ones that I mainly mentioned in my report.

 Q. Was there sufficient amount of root to perform a DNA analysis?

 A. No, there was not.

 Q. What is your conclusion as to the hair that was found on the tape lift and -
- in comparison to the hair, known sample of hair from Mr. Chavez?

 A. The unknown hair was consistent with the known head hair sample of Juan
Chavez. 


On cross-examination, the following exchange between Chavez's attorney and Lind took
place:

 A. Are you saying can I identify that this is Mr. Chavez's hair that's on the
tape lift? Is that what you're asking me, sir?

 Q. Yes, ma'am.

 A. No, I cannot identify it as Mr. Chavez's hair. 

 Q. In fact, it would be quite possible that folks of the same race would share
characteristics on their head samples - - hair samples?

 A. Yes, sir.

 During summation the prosecutor emphasized Lind's testimony by saying the hair
found in Martinez's apartment "matched or was consistent with" Chavez's hair. The
prosecutor also emphasized Martinez's testimony that her assailant had "curly hair" when she
said, "You can change the cut of your hair. You can make your hair straight. But you can't
change the inside of your hair."

 Chavez presented an alibi. According to his testimony, during the entire assault, he
was either at his or a friend's apartment, school, a restaurant, or playing volleyball in
Pasadena. He accounted for more than all of the relevant time periods, from 2:00 a.m. to
nearly 10:00 p.m., on the day Martinez was assaulted. And he had five witnesses testify in
support of his alibi. He also made statements concerning his alibi to Sergeant Angeli during
the live lineup and to Teresa Farfan, a news reporter who interviewed him shortly before his
trial. During cross-examination, when the prosecutor asked about the bluish tattoo on his
wrist, Chavez denied ever having one. However, he did have a scar where Martinez saw the
tattoo, and the record reflects that this scar was shown to the jury. 

 Rejecting Martinez's alibi-defense, the jury found Chavez guilty of two counts of
aggravated sexual assault and sentenced him to thirty-five years' imprisonment for each
count. In an unpublished opinion, the First Court of Appeals affirmed Chavez's conviction. (1) 

Applicant's Post-Conviction Motions for DNA Testing

 In February 2006, Chavez filed a motion for forensic DNA testing of the unknown
hair that Lind testified about at Chavez's trial. The trial judge denied the motion, and the
First Court of Appeals affirmed the denial. (2) In December 2007, Chavez filed a second
motion for forensic DNA testing. This time the State agreed that Chavez was entitled to
testing. The hair was subjected to DNA testing, and the results excluded Chavez as its
source. 

Habeas Proceedings

 After receiving the DNA test results, in 2009, Chavez filed an application for a writ
of habeas corpus. He alleged, among other things, that he is entitled to a new trial because
the State presented false testimony when Lind testified that the unknown hair found at
Martinez's apartment matched his known hair. The habeas judge held a hearing and adopted
Chavez's proposed findings of fact and conclusions of law, which state, in relevant part:


 On May 12, 1992, Martinez was followed home from a grocery store
by a man wearing sunglasses.

 When Martinez returned, the man, still wearing sunglasses, emerged
from the closet and sexually assaulted her orally and anally.

 Police officers collected hairs from the area of the floor in Martinez's
apartment where the assault happened.

 Martinez was taken to a hospital for a sexual-assault examination in
which oral and anal swabs, and loose head and pubic hair, were
collected from her body. 

 Martinez told the hospital staff that, prior to her assault, the last time
she had sexual relations was in December 1991.

 Martinez saw Chavez, whom she believed to be her assailant, in a
grocery store on July 19, 1992, and a police officer working in the store
arrested Chavez.

 HPD criminalist Deborah Lind testified that she microscopically
examined the hairs found at Martinez's apartment, that one of the hairs
was very similar to Chavez's in diameter, color, color pattern, and
pigment, and that the length of that hair was the same as Chavez's hair.

 Chavez testified at trial and presented an alibi defense.

 The State argued during summation that the hair found in Martinez's
apartment matched Chavez's hair.

 During summation, the State argued that Chavez, in preparation for
trial, could change the length and cut of his hair, but not its contents. 

 Mitochondrial DNA (mtDNA) testing was not available at trial.

 The State ultimately agreed to mtDNA testing of the hair in question.

 The results of the mtDNA testing excluded Chavez as the source of the
hair.

 Due to the newly available DNA evidence excluding Chavez as the
source of the hair, he is entitled to a new trial.

 Chavez was convicted and sentenced to thirty-five years' in prison
based on the State's argument that he was the source of the hair.

 But for Lind's testimony supporting the State's argument, and the
State's summation, there is a reasonable probability that the jury would
have acquitted Chavez.



Based on these findings, the habeas judge recommends granting relief. 

 Chavez contends that Lind's testimony is false. He argues that this use of false
testimony elicited from Lind, and emphasized during the State's summation, entitles him to
relief. We filed and set this case to determine whether the State presented false testimony
and, if so, whether Chavez is entitled to relief based on our opinion in Ex parte Chabot, in
which we held that due process is violated when the State unknowingly presents perjured
testimony at trial. (3) 

Analysis

 A trial judge has a unique opportunity to observe witness demeanor first-hand and
therefore has the best vantage point to assess witness credibility. (4) Accordingly, we ordinarily
accept a trial judge's findings of fact and conclusions of law. (5) But

 [w]hen our independent review of the record reveals findings and conclusions
that are unsupported by the record, we will, understandably, become skeptical
as to the reliability of the findings and conclusions as a whole. In such cases,
we will proceed cautiously with a view toward exercising our own judgment. 
And when we deem it necessary, we will enter alternative or contrary findings
and conclusions that the record supports. Furthermore, when we determine
that the trial judge's findings and conclusions that are supported by the record
require clarification or supplementation, we may exercise our judgment and
make findings and conclusions that the record supports and that are necessary
to our independent review and ultimate disposition. (6)

 In Chabot, we held that the State's unknowing use of perjured testimony "is a trial
error that is subject to a harmless error analysis," and "'the applicant has the burden to prove
by a preponderance of the evidence that the error contributed to his conviction or
punishment.'" (7) "Testimony that is untrue" is one of many ways jurists define false
testimony. (8) The Supreme Court has indicated that "improper suggestions, insinuations and,
especially, assertions of personal knowledge" constitute false testimony. (9) Recently, at the
beginning of this term, we looked at the various definitions of perjury: (10) The First Circuit
described perjury as "the willful intent to provide false testimony, rather than as a result of
confusion, mistake, or faulty memory." (11) And the Fifth Circuit found that witness response
to questioning plays a large role in determining whether perjury has been committed when
it stated that "[t]he Agents did not candidly respond to the defense counsel's questions, and
the prosecuting attorney did nothing to correct the Agents' evasive testimonies." (12)

 Regardless of how we define perjury or false testimony in the context of a due process
violation, we disagree with the trial judge's recommendation to grant relief. Lind's
testimony that the hair from the tape lift shared similar physical characteristics with Chavez's
known hair has not been proven to be false. (13) Lind clearly stated that she could not positively
identify the unknown hair as Chavez's. After examining the hairs from the tape lift under
both stereo and comparison microscopes, Lind testified that the physical characteristics of
those hairs were consistent with the physical characteristics of Chavez's hair. She stated that
the length, coloring pattern, pigment distribution, and cuticles of the hair from the tape lift
and Chavez's known hair sample were similar. Lind's testimony is not false just because
post-conviction DNA testing later proved that the hair did not come from Chavez. (14) The
similarities between the physical characteristics of the unknown hair and Chavez's hair
identified by Lind at Chavez's trial have not been refuted. 

 Finally, even if we assumed that Chavez has shown a due process violation, we would
find no harm. (15) First, the DNA test results do not exonerate Chavez. That the hair is not
Chavez's does not conclusively establish that he did not commit the sexual assault. 

 In Jacobs v. State, Jacobs was convicted of aggravated sexual assault. (16) Jacobs filed
a post-conviction motion for DNA testing of two hairs from the scene of the offense. (17) In
the Texarkana Court of Appeals, Jacobs argued that DNA testing could implicate a third
party and thereby exonerate him. (18) In affirming the trial judge's denial of DNA testing, the
court of appeals reasoned that even if DNA testing proved that the hairs came from a third
party, it would show only "that a third party had, at some point in time (but not necessarily
at the time of the crime), been inside the sleeper compartment of the tractor truck." (19) The
court went on to note that had the sexual assault examination yielded blood or seminal fluid
from the rapist, its conclusion might have been different, but the presence of a third party's
hair on Jacob's bed linens or clothing that does not belong to the victim does not conclusively
prove Jacob's innocence. (20) 

 Similar reasoning can be applied to this case. Because the hair at issue came from
Martinez's living room--a common area open to visitors--as opposed to her body, the fact
that it is not Chavez's shows only that a third party may have been, at some time, though not
necessarily at the time of the assault, in her apartment before the tape lifts were taken. 
Further, the DNA test results could not exclude either of Martinez's brothers as contributors
of the hair. That either of Martinez's brothers, or another unidentified party, were in her
apartment does not exonerate Chavez. 

 Martinez's consistent and repeated identifications militate against a finding of harm. (21) 
She first spotted him by happenstance approximately a month after her assault while riding
a city bus. When Martinez and Ibarra boarded the bus, Chavez was already there. During
the two and a half to three mile drive, Martinez noticed the man who had attacked her. She
told Ibarra that her assailant was on the bus. Ibarra testified that Martinez "was very afraid,"
and that "she wanted . . . to get home fast." Ibarra also testified that Martinez told her not
to look at Chavez because "she was afraid that he saw us," and that Martinez was "shaking." 
Further, both women testified that Chavez was hiding himself behind other passengers on the
bus. And Ibarra testified that "he got off the bus real fast . . . almost running through the
stairs." 

 Martinez saw Chavez a second time at the Fiesta Mart where Chavez was arrested and
taken into custody. While Martinez was shopping with Ibarra, Chavez walked by her and
turned to look at her twice. Martinez and Ibarra each summoned a security guard. The guard
that Martinez summoned testified that the man pointed out to him as Martinez's assailant
"appeared nervous" and was acting as if he wanted to leave Fiesta "immediately." Officer
Goode, the security guard that Ibarra summoned, testified that as Martinez watched Chavez
being arrested and taken into custody, she was "crying," "pretty hysterical," and "shaking
quite a bit." She even "went into a trance-like condition," "was very pale and limp," and
"looked like she was motioning her mouth," but "couldn't get her mouth open." Officer
Goode eventually called paramedics to take care of Martinez.

 Notably, Chavez's behavior--when encountered by Martinez fortuitously on two
occasions--evidences his recognition of Martinez in association to the offense. (22) Each time
Chavez was spotted by Martinez, he exhibited signs of being nervous and attempted to evade
Martinez. 

 Martinez also gave an accurate description of Chavez to the sketch artist. Martinez's
description included a thin scar on Chavez's right cheek, which was noted before the jury by
the prosecutor and defense counsel at Chavez's trial. The jury was also shown a scar on
Chavez's right wrist, exactly where Martinez described having seen the bluish tattoo. At
trial, when the prosecutor asked Martinez who assaulted her, she identified Chavez. 

 Last, while Chavez did present an alibi, the jury did not find it credible. Chavez
testified that on the day of the assault he was at school, a restaurant, a friend's apartment, and
playing volleyball in Pasadena. Minutes before the live lineup from which Martinez
identified Chavez as her assailant, Chavez told Sergeant Angeli that he was at school on the
day of the assault. But when Sergeant Angeli asked Chavez which campus, Chavez had no
answer. Sergeant Angeli testified that "the conversation from there on went kind of
downhill. It was evasive . . . ." Chavez testified that, on the day of the assault, after leaving
school, he ended up in Pasadena playing volleyball. But when speaking with Sergeant
Angeli, he failed to mention anything about playing volleyball. Years after the incident, as
the time for trial approached, Chavez was interviewed by Teresa Farfan, a news reporter. 
She testified that when she questioned Chavez about his whereabouts on the day of the
assault, he told her that "he and another friend went out of his apartment to have something
to eat and then leave to Pasadena." Farfan continued, "He mentioned something about
Houston Community College but I don't recall if it was that time." Chavez hardly mentioned
being at school on the day of the assault, something which he and one of his alibi witnesses
stressed while testifying. Chavez told three versions about his whereabouts on the day of the
offense. Additionally, although Chavez presented five witnesses to corroborate his alibi, the
jury, as indicated by its verdict, did not believe them. Indeed, the trial judge, in his findings
of fact, did not suggest that the alibi defense was credible; instead, he merely found the
obvious: "Chavez testified at trial and presented an alibi defense." Based upon the record
before us, as well as the trial judge's factual finding that failed to find the alibi defense
credible, we conclude that Chavez's alibi evidence is not believable. 

 Based on the foregoing, even if we assumed that Chavez has shown a due process
violation, we conclude he cannot show harm. 

Conclusion

 Contrary to the trial judge's findings and conclusions, we hold that Martinez has not
shown a due process violation; therefore, we deny relief. 


DATE DELIVERED: November 17, 2010 

DO NOT PUBLISH
1. Chavez v. State, No. 01-93-00350-CR, 1994 Tex. App. LEXIS 225 (Tex.
App.--Houston [1st Dist.] 1994).
2. Chavez v. State, No. 01-06-00357-CR, 2007 Tex. App. LEXIS 9947 (Tex.
App.--Houston [1st Dist.] 2007).
3. 300 S.W.3d 768, 772 (Tex. Crim. App. 2009).
4. Ex parte Van Alstyne, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007).
5. Id.
6. Ex parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (citing Ex parte Young,
418 S.W.2d 824, 829 (Tex. Crim. App. 1967); Ex parte Adams, 768 S.W.2d 281, 288 (Tex.
Crim. App. 1989); Ex parte Van Alstyne, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per
curiam)). 
7. Ex parte Chabot, 300 S.W.3d 768, 771 (quoting Ex parte Fierro, 934 S.W.2d 370,
374 (Tex. Crim. App. 1996)).
8. Black's Law Dictionary1485-86 (7th ed. 1999).
9. See Berger v. United States, 295 U.S. 78, 88 (1935).
10. Napper, 2010 Tex. Crim. App. LEXIS 1209, at *111.
11. United States v. Tavares, 93 F.3d 10, 14 (1st Cir. 1996).
12. United States v. Carter, 566 F.2d 1265, 1270 (5th Cir. 1978).
13. See Napper, 2010 Tex. Crim. App. LEXIS 1209, at *111-12 (holding that even
though the HPD criminalist gave inaccurate testimony regarding his statistical frequency
estimate, which was based on his DNA analysis, he did not commit perjury).
14. See id.
15. Ex parte Chabot, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009).
16. 115 S.W.3d 108, 110 (Tex. App.--Texarkana 2003).
17. Id. at 110-11.
18. Id. at 113.
19. Id.
20. Id. at 113-14.
21. See Motilla v. State, 78 S.W.3d 352, 358-59 (Tex. Crim. App. 2002) (holding that
the improper admission of evidence at a murder trial was harmless in light of substantial
evidence of guilt); Prior v. State, 647 S.W.2d 956, 959-60 (Tex. Crim. App. 1983) (finding
that "the erroneous admission of the extraneous offenses did not contribute to the finding of
guilty or to the punishment assessed" because "the evidence of guilt was overwhelming, even
without the extraneous offenses."); Little v. State, 567 S.W.2d 502, 505 (Tex. Crim. App.
1978) (holding that the State's improper argument was harmless error due to the existence
of overwhelming evidence of guilt); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir.
2008) (holding that overwhelming evidence of guilt precluded appellant from establishing
the prejudice necessary to prevail on his ineffective assistance of counsel claim); Sayre v.
Anderson, 238 F.3d 631, 635 (5th Cir. 2001) (where a habeas petitioner claimed that his trial
counsel was ineffective for denying him his right to testify at trial, the court found that
"[c]onsidering the overwhelming evidence of Sayre's guilt, we cannot conceive of anything
Sayre could have said that would have provided any reasonable possibility of a different
outcome."). 
22. Colella v. State, 915 S.W.2d 834, 839 n.7 (Tex. Crim. App. 1995) ("[w]e have
repeatedly held that flight is evidence of a circumstance from which an inference of guilt may
be drawn." (quoting Foster v. State, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989))); see also
Hernandez v. State, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997); Valdez v. State, 623
S.W.2d 317 (Tex. Crim. App. 1981); Holloway v. State, 525 S.W.2d 165 (Tex. Crim. App.
1975).